

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-08-00210-CV

| | |
|---|---|
| LOURDES MARIA VARGAS DE DAMIAN, INDIVIDUALLY, AS NEXT FRIEND TO NICOLE DENISSE DAMIAN VARGAS, AND AS REPRESENTATIVE OF THE ESTATE OF DEMETRIO DAMIAN CHEN, DECEASED; GUILLERMO JOSE GASPERI, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF GLORIA GASPERI, DECEASED; CARLA GASPERI, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF GLORIA GASPERI, DECEASED; ANGELA CECILIA LASSEN DE GASPERI, AS LEGAL AND PERSONAL REPRESENTATIVE OF THE ESTATE OF GLORIA GASPERI; RICARDO ADOLFO GARAY BARRIOS; LORENZO ROMAGOSA ACRICH; AND IDA ROMAGOSA DE ARANJO | APPELLANTS AND APPELLEES |

V.

| | |
|---|---|
| BELL HELICOPTER TEXTRON, INC. | APPELLEE AND APPELLANT |

------------

## FROM THE 352ND DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

-----------

## I. Introduction

Appellants[1] filed this lawsuit against Appellee Bell Helicopter Textron, Inc.[2] on January 25, 2002, alleging, among other things, strict products liability and negligence, relating to the crash of a Bell 407 helicopter. The case proceeded to a jury trial in August 2007, and the jury returned its verdict on September 17, 2007. The jury found that there was a design defect in the helicopter; that the negligence of Bell and one of the helicopter pilots, Captain Damian, caused Appellants' injuries; that Bell and Captain Damian were each fifty-percent responsible for causing the accident and resulting injuries; and that Appellants' damages totaled $294,300. The jury also found that Bell did not act with malice. The trial court signed the final judgment on February 28, 2008.

All parties appeal from the judgment. Appellants contend in six issues that the trial court erred by not permitting equitably-adopted children to assert wrongful death claims, that there is insufficient evidence of comparative

---

[1] Appellants-Cross Appellees are Lourdes Maria Vargas de Damian, individually, as next friend to Nicole Denisse Damian Vargas, and as representative of the estate of Demetrio Damian Chen, deceased; Guillermo Jose Gasperi, individually and as representative of the estate of Gloria Gasperi, deceased; Carla Gasperi, individually and as representative of the estate of Gloria Gasperi, deceased; Angela Cecilia Lassen de Gasperi, as legal and personal representative of the estate of Gloria Gasperi; Ricardo Adolfo Garay Barrios; Lorenzo Romagosa Acrich; and Ida Romagosa de Aranjo. We refer to Appellants-Cross Appellees collectively as Appellants.

negligence, that the damage awards are against the great weight and preponderance of the evidence, and that the trial court should have conducted a hearing and ordered a new trial for alleged juror misconduct. In its cross-appeal, Bell contends in six issues that all of Appellants' claims are barred by the Panamanian statute of limitations, that the trial court should have dismissed the survival claims by Gloria Gasperi's estate, that the design-defect and negligence claims submitted to the jury are preempted by federal law, and that there is no evidence of design-defects. We affirm in part and reverse and render in part.

## II. Factual Background

Appellant Lorenzo Romagosa testified that he is the manager of the purchasing and export department of Café Duran, a coffee company his family owns in Panama City, Panama. On January 27, 2000, Lorenzo, his father, and two of his aunts, Ida Rebecca and Gloria Gasperi, flew on a Bell 407 helicopter from Panama City to conduct business at one of Café Duran's farms in Sona, Panama. Captains Damian and Garay piloted the helicopter. After the family conducted its business at the company farm, Lorenzo's father stayed in Sona, and Captains Damian and Garay, Lorenzo, Ida, and Gloria boarded the helicopter for the return flight to Panama City. Visibility was good in the area, and they experienced no problems for most of the flight.

---

[2]We refer to Appellee-Cross Appellant as Bell.

3

Approximately fifty minutes into the flight, and only ten minutes from Panama City, Lorenzo heard Captain Garay say, "birds ahead." Approximately thirty to sixty seconds later, Lorenzo heard Captain Garay say "watch out" in a high tone of voice. Lorenzo testified the helicopter then made an abrupt maneuver, and he felt the helicopter nose pull up drastically, heard a loud noise, noticed a lot of wind going through the cabin, and saw a bird pass by him and hit Gloria in the right shoulder. The helicopter had struck a bird, which penetrated the windshield and entered into the cabin. Lorenzo testified he was thinking at that point that the helicopter would crash; both of his aunts were screaming, and there were a lot of feathers and wind in the cabin.

Lorenzo testified that Captain Garay called out Captain Damian's name and then asked him for help. The bird had hit Captain Damian in the head, and he had slumped over the helicopter controls; the bird did not hit Captain Garay. Lorenzo unbuckled his seat belt, moved behind Captain Damian's seat, and tried to pull Captain Damian back from the controls so that Captain Garay could fly the helicopter. Lorenzo testified the helicopter was "going fast, down" and Captain Garay was trying to control the helicopter. Lorenzo testified that just after he pulled Captain Damian back from the controls, he sat in the seat behind Captain Damian "split seconds" before the helicopter crashed into the mountainous terrain. He said that the helicopter hit the slope and rolled or descended down

4

the hill before stopping. All of the helicopter's occupants were injured in the crash, and Captain Damian's and Gloria's injuries were fatal.

Bobby Ross testified as Appellants' aircraft accident reconstruction and helicopter pilot expert. He testified that the crashed helicopter was a Bell 407 and that the helicopter was manufactured in 1997 and delivered in 1998. Based on his review of the testimony and physical evidence from the accident, Ross prepared an animation reflecting his reconstruction of the flight and the crash, and he described the animation in detail to the jury. Ross testified that the helicopter was flying at 120 knots forward air speed and at 1,500 feet above sea level just before colliding with the bird, a black vulture. Ross testified that Captains Damian and Garay were not negligent, that they did all they could to save the helicopter and its passengers, and that they did not proximately cause the accident.

Ross testified that the helicopter hit the terrain tail-first; that the bottom of the helicopter then hit, pushing the landing gear nineteen inches into the body; that the helicopter slid down the hill; that the doors came off; but that Gloria was still restrained inside the helicopter at the time. Ross averred that the helicopter remained upright for two-thirds of its slide down the hill; that the marks on the wreckage suggest that it slid on its right side where Captain Damian and Gloria

5

were seated; but that the right-side door had separated from the helicopter, allowing Gloria to be partially ejected during the crash sequence.

On cross-examination, Ross acknowledged that the Bell 407 has excellent visibility and maneuverability and that the as-cast acrylic windshield on the Bell 407 gets "high marks" for optical clarity. Ross testified that a clear windshield is important, that windshields are very expensive to replace, and that the down time while waiting for a windshield replacement is unwanted. Ross said that the Bell 407 is a Part 27 helicopter, and he agreed that virtually all Part 27 aircraft have as-cast acrylic windshields like the Bell 407 and that there are no bird-impact resistance requirements under the Federal Aviation Act (FAA) or the Federal Aviation Regulations for Part 27 aircraft. Ross also testified that Part 29 helicopters are larger, that federal regulations require Part 29 helicopters to have 2.2-pound resistant windshields, that the black vulture that hit the Bell 407 weighed significantly more than 3.5 pounds, and that the bird was significantly larger than even Part 29 helicopters are designed to resist.

Billy Hinds, Appellants' windshield expert, is an aircraft structural design engineer with more than thirty years' experience designing aircraft transparencies. He has designed bird-impact resistant windshields for aircraft such as the F-111 fighter jet, the F-17 stealth fighter jet, and the B-1 bomber. He testified at trial that the as-cast acrylic windshield in the Bell 407 was

6

unreasonably dangerous and defectively designed because it was not bird-impact resistant and that the defective design was a proximate and producing cause of the crash. Hinds testified that a 0.14 inch stretched acrylic windshield and a 0.1 inch polycarbonate windshield are safer alternative materials than the as-cast acrylic windshield on the Bell 407 and that both were technologically and economically feasible at the time the Bell 407 was manufactured in 1997. He also testified that the technology existed in 1997 to properly "mate" stretched acrylic or polycarbonate windshields to the structure of the helicopter and resist an impact with a bird.

William Muzzy, Appellants' seatbelt expert, testified about the restraint system Gloria was wearing at the time of the crash and how it improperly allowed her to be partially ejected from the helicopter during the crash sequence. Using the animation of the crash sequence, Muzzy demonstrated each of the times that Gloria's restraint would have locked and then unlocked. Muzzy testified that even though Gloria still had her seatbelt on, she was partially ejected from the helicopter during the crash sequence because the locking and unlocking in the restraint system allowed the seatbelt to continually extend to the point where it did not restrain her in her seat or even inside the helicopter. He testified that the restraint system worked as it was designed but that it should have been designed so that it would not lock and unlock. Muzzy testified that the restraint system in

7

the Bell 407 was unreasonably dangerous and that the use of the restraint system in the Bell 407 was negligence. Muzzy also testified that the MA-16 was a safer alternative design than the restraint system in the Bell 407 because the MA-16 has an omni-directional sensing retractor that would not have allowed Gloria's seatbelt to unlock during the crash sequence. Muzzy testified that "the lack of an omni-directional vehicle sensing retractor . . . in the aircraft was the proximate cause of [Gloria] being ejected and [her] subsequent death."

### III. Federal Preemption

In its first issue, Bell contends that the FAA and related federal regulations, through field preemption, impliedly preempt all common-law claims relating to helicopter design and airworthiness. Alternatively, Bell contends that federal regulations have impliedly preempted the field of helicopter windshield design and bird-strike resistance through conflict preemption.

### A. Preemption Law

Federal preemption of state law is grounded in the Supremacy Clause of the United States Constitution, which provides that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2; *Delta Air Lines, Inc. v. Black*, 116 S.W.3d 745, 748 (Tex. 2003); *see MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d

8

475, 481 (Tex. 2010). Under the Supremacy Clause, if a state law conflicts with federal law, the state law is preempted and will have no effect. *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S. Ct. 2114, 2128–29 (1981); *Black*, 116 S.W.3d at 748. We presume federal law does not bar the state's exercise of its historic police powers unless Congress clearly expresses the intent to preempt such state action. *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S. Ct. 1671, 1676 (1995).

The purpose of Congress is the ultimate touchstone in every preemption case. *Retail Clerks Int'l Ass'n v. Schermerhorn*, 375 U.S. 96, 103, 84 S. Ct. 219, 223 (1963); *Black*, 116 S.W.3d at 748. We discern congressional intent primarily from the statute's language and structure. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486, 116 S. Ct. 2240, 2250–51 (1996); *Black*, 116 S.W.3d at 748. Also relevant is the purpose of the statute as a whole, which is revealed through "the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic, Inc.*, 518 U.S. at 486, 116 S. Ct. at 2251; *Black*, 116 S.W.3d at 748–49.

"Preemption can take one of several forms." *Black*, 116 S.W.3d at 748. Express preemption occurs when a federal law may expressly preempts a state law. *Id.*; *Great Dane Trailers, Inc. v. Estate of Wells*, 52 S.W.3d 737, 743 (Tex.

9

2001). A federal law may also impliedly preempt a state law "(i) when the scheme of federal regulation is sufficiently comprehensive to support a reasonable inference that Congress left no room for supplementary state regulation or (ii) if the state law actually conflicts with federal regulations." *Black*, 116 S.W.3d at 748; *see Hinton*, 329 S.W.3d at 482. A state law presents an actual conflict when a party cannot comply with both state and federal regulations, or when the state law would obstruct Congress's purposes and objectives. *See Hinton*, 329 S.W.3d at 482; *Black*, 116 S.W.3d at 748. Bell does not contend that Appellants' claims are expressly preempted. Thus, we confine our inquiry to the two types of implied preemption: field preemption and conflict preemption. *See Black*, 116 S.W.3d at 748; *Great Dane Trailers*, 52 S.W.3d at 743.

**B. Analysis**

### 1. Field Preemption

Bell first contends that federal law, through field preemption, impliedly preempts all common-law claims relating to helicopter design and airworthiness. Appellants counter that although "claims regarding prices, airspace management, pilot qualifications, and failure to warn" are preempted, courts throughout the country have determined that the FAA and related federal regulations do not

preempt claims against manufacturers for defective product designs. Neither party cites binding precedent that governs our analysis.[3]

### a. Texas Civil Practice and Remedies Code Section 82.008

Citing civil practice and remedies code section 82.008, Bell argues that "Texas's public policy position on the preemptive effect of federal safety regulations is clear" because section 82.008 "creates a 'rebuttable presumption' of non-liability for defective design if the product in question 'complied with mandatory safety standards or regulations adopted and promulgated by the federal government.'" *See* Tex. Civ. Prac. & Rem. Code Ann. § 82.008(a) (West 2009). We disagree for several reasons.

First, the ultimate touchstone in every preemption case is the intent of Congress, not Texas public policy. *Schermerhorn*, 375 U.S. at 103, 84 S. Ct. at 222–23; *Black*, 116 S.W.3d at 748. Second, Appellants filed this lawsuit in 2002 before the effective date of section 82.008. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 5.02, 2003 Tex. Gen. Laws 847, 861; *see also Gen. Motors Corp.*

---

[3]The parties do reference *Geier v. American Honda Motor Co.*, 529 U.S. 861, 120 S. Ct. 1913 (2000) and *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 93 S. Ct. 1854 (1973), but neither case addresses the issue presented here. In *Geier*, the Supreme Court held that a common law tort action for negligent failure to equip an automobile with an airbag was preempted because it conflicted with the applicable federal law. 529 U.S. at 881–82, 120 S. Ct. at 1925–26. In *City of Burbank*, the Supreme Court held that the field of aviation noise control is preempted but did not address the field of aviation safety. 411 U.S. at 638–40, 93 S. Ct. at 1862–63.

*v. Burry*, 203 S.W.3d 514, 549 (Tex. App.—Fort Worth 2006, pet. denied) (noting that section 82.008 applies only to suits filed on or after July 1, 2003). Third, the rebuttable presumption in section 82.008 arises only after the manufacturer "establishes that the product's . . . design complied with mandatory safety standards or regulations . . . that were applicable to the product at the time of manufacture and that governed the product risk that allegedly caused harm." Tex. Civ. Prac. & Rem. Code Ann. § 82.008(a). But Bell does not point to any federal statute or regulation setting forth mandatory safety standards applicable to bird strikes for Part 27 aircraft like the Bell 407 helicopter involved in this case. Thus, even if section 82.008 applied, Bell has not established that its design of the Bell 407 complied with applicable mandatory safety standards or regulations. Therefore, we are not persuaded that section 82.008, a statute enacted after this lawsuit was filed, suggests or requires a finding that federal law preempts Appellants' design defect and negligence claims relating to the Bell 407 Helicopter.

### b. FAA Certification Process

Bell also argues that the FAA certification process is evidence of field preemption. Under the FAA and applicable regulations, a manufacturer must receive a "type certificate" before manufacturing a new aircraft, indicating the FAA's approval of an aircraft's basic design and ensuring that the design

complies with all applicable FAA regulations. *See* 49 U.S.C. § 44704(a) (2006); 14 C.F.R. § 21.21 (2005). The manufacturer must then obtain a "production certificate" indicating the FAA's approval of the manufacturing process that will be used to construct the approved design. *See* 49 U.S.C. § 44704(c); 14 C.F.R. §§ 21.139, .143 (2005). Finally, the owner of the aircraft must obtain an "airworthiness certificate" to prove the aircraft is in a safe operating condition and conforms to the type certificate before the aircraft can be put into service. *See* 49 U.S.C. § 44704(d); 14 C.F.R. § 21.183.

Bell argues that the "type certificate" procedural regulations "illustrate that the Federal Aviation Administration is intricately involved with the design of any new aircraft and any modifications to the design." However, the court in *Monroe v. Cessna Aircraft Co.* addressed and rejected this very argument. *See* 417 F. Supp. 2d 824, 833 (E.D. Tex. 2006). In doing so, the court stated,

> The FAA's three-phase certification process for aircraft does not create a pervasive regulatory scheme demonstrating an intent by Congress to preempt either the field of aviation safety or state defective design claims. . . . [T]he regulations requiring the certification process do not themselves set out safety and design standards. . . . The regulations that do control the design and safety of an aircraft are broad and provide a non[-]exhaustive list of minimum requirements leaving discretion to the manufacturer. For example, the regulations governing a flight manual's contents leave room for "other information that is necessary for safe operation because of design, operating, or handling characteristics." . . . [And] the regulation that lists the required contents of an aircraft flight manual has a non-exhaustive list. . . . The certification process looks to these safety and design regulations set out by the FAA but does

13

> not in and of itself constitute a pervasive regulatory scheme evidencing an intent by Congress to preempt the field of aviation safety.

*Id.* at 833 (internal citations omitted). Significantly, *Monroe* involved a claim for "failing to design and manufacture the aircraft to reduce potential structural damage resulting from a bird strike." *Id.* at 826–27. We agree with the *Monroe* court's analysis and hold that the certification process "does not in and of itself constitute a pervasive regulatory scheme evidencing an intent by Congress to preempt the field of aviation safety." *Id.* at 833.

### c. Implied Preemption in the Fifth Circuit

Bell cites *Witty v. Delta Air Lines, Inc.* and argues that "implied preemption is alive and well in the [Fifth] Circuit." *See* 366 F.3d 380, 383–85 (5th Cir. 2004). Witty sued Delta in a Louisiana federal district court alleging that he developed deep vein thrombosis while on a flight from Louisiana to Connecticut. *Id.* at 381. Witty alleged that Delta negligently failed to warn passengers about the risks of deep vein thrombosis in pressurized cabins and negligently failed to provide adequate leg room to prevent deep vein thrombosis. *Id.* at 382. Delta argued that Witty's claims were preempted, and the Fifth Circuit agreed and held that "federal regulatory requirements for passenger safety warnings and instructions are exclusive and preempt all state standards and requirements." *Id.* at 382, 385. However, the *Witty* court narrowly limited the application of its opinion,

14

stating "we note our intent to decide this case narrowly by addressing the precise issues before us." *Id.* at 385. Thus, while implied field preemption may be "alive and well" in the Fifth Circuit as Bell suggests, the *Witty* opinion itself does not address whether Appellants' design defect claim relating to the helicopter's windshield is preempted.

### d. Other Jurisdictions

Citing *Abdullah v. American Airlines, Inc.*, 181 F.3d 363 (3rd Cir. 1999), Bell argues that we should hold "that the FAA impliedly preempts any common-law claims related to helicopter design and airworthiness." In *Abdullah*, the Third Circuit addressed whether federal law preempted the plaintiffs' common-law claims for failing to take reasonable precautions to avoid known turbulent conditions and failing to give warnings so that the plaintiffs could protect themselves from the injuries they sustained due to severe turbulence during flight. *Id.* at 365. The court found that "relevant federal regulations establish complete and thorough safety standards for interstate and international air transportation that are not subject to supplementation by, or variation among, jurisdictions." *Id.* at 367. Thus, the *Abdullah* court held that "federal law establishes the applicable standards of care in the field of air safety, generally, thus preempting the entire field from state and territorial regulation." *Id.*

However, cases from the Sixth, Ninth, and Eleventh Circuits conflict with *Abdullah*. In each of those cases, the respective courts held that the FAA did not preempt defective product claims similar to those asserted by Appellants in this case. *See Martin v. Midwest Express Holdings, Inc.*, 555 F.3d 806, 808–12 (9th Cir. 2009) (distinguishing *Abdullah* and holding plaintiff's claims for defective design of aircraft stairs not preempted by FAA); *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 788–89, 791, 794–95 (6th Cir. 2005) (citing *Abdullah* to find FAA preempted failure to warn claim but applying state law to claim of defectively manufactured navigational instrument and concluding plaintiff did not offer sufficient evidence of a manufacturing defect); *Pub. Health Trust of Dade Cnty., Fla. v. Lake Aircraft, Inc.*, 992 F.2d 291, 292, 295 (11th Cir. 1993) (holding FAA did not preempt passenger's defective seat design claim). In addition, a federal district court in Texas held that the FAA did not preempt state-law defective design claims relating to bird-strike safety standards. *See Monroe*, 417 F. Supp. 2d at 836.

Although these cases are not binding precedent, we find the reasoning from the Sixth, Ninth, and Eleventh Circuits and the federal district court persuasive. Although the FAA regulates many aspects of aviation, "[n]either the [FAA] itself, nor its legislative history evidence an intent by Congress to preempt the entire field of aviation safety. Instead, the [FAA] and its legislative history

16

demonstrate an acknowledgment by Congress that state law tort claims are viable under the [FAA]." *Id*. at 830; *see Martin*, 555 F.3d at 809–12; *Lake Aircraft, Inc.*, 992 F.2d at 295. We decline to hold that the FAA impliedly preempts the field of common-law claims related to helicopter design and airworthiness, and we overrule this part of Bell's first issue.

## 2. Conflict Preemption

Bell also contends that federal regulations have impliedly preempted claims regarding helicopter windshield design and bird-strike resistance through conflict preemption. Specifically, Bell argues that because there is a federal regulation requiring Party 29 "transport category" helicopters to be "capable of safe flight and landing after impact by a 2.2 pound bird at certain velocities" and "there is no comparable requirement for 'normal' category helicopters like the [Part 27] Bell 407 at issue in this case," the fact that the Federal Aviation Administration "imposed a bird-strike standard on one type of helicopter and not another speaks volumes." According to Bell, "short of direct conflict with an actual regulation, there is no better evidence of 'conflict' preemption." Appellants respond that the "failure to adopt a bird-strike requirement applicable to the [Part 27] Bell 407 cannot create a basis for conflict preemption."

Bell cites cases from the United States Supreme Court, the Fifth Circuit, and the Texas Supreme Court for two propositions: (1) that a common-law

standard that is more stringent than a federal regulation is preempted if there is evidence that the federal agency considered and rejected the more stringent standard and (2) that an agency's "'delicate balance' of cost or efficiency versus safety should be respected." *See Geier*, 529 U.S. at 879–81, 120 S. Ct. at 1924–25; *Carden v. Gen. Motors Corp.*, 509 F.3d 227, 231–32 (5th Cir. 2007); *BIC Pen Corp. v. Carter*, 251 S.W.3d 500, 506–07 (Tex. 2008). However, Bell does not point to any evidence that the Federal Aviation Administration considered minimum standards for bird-strike resistance on Part 27 aircraft like the Bell 407 at issue in this case. Instead, Bell points only to evidence that the Federal Aviation Administration considered bird-strike safety proposals relating to Part 29 "transport" aircraft. Without evidence that the Federal Aviation Administration considered and rejected minimum bird-strike standards in Part 27 aircraft like the Bell 407, Bell has not met its "difficult burden of overcoming the presumption against preemption." *Great Dane Trailers*, 52 S.W.3d at 743 (citing *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 255, 104 S. Ct. 615, 625 (1984)). To borrow the *Monroe* court's language discussing field preemption, "If anything, the specific lack of bird strike regulations related to the [aircraft at issue] demonstrates the absence of a pervasive regulatory scheme and leaves room for state law claims on the issue." 417 F. Supp.2d at 834.

18

Because there are no federal statutes or regulations governing the minimum standards for bird-strike resistance in Part 27 helicopters like the Bell 407, we cannot conclude that Texas's common-law design defect cause of action makes it impossible for Bell to comply with both state and federal requirements or that the cause of action is an obstacle to the purposes and objectives of Congress. *See Sprietsma v. Mercury Marine*, 537 U.S. 51, 65–68, 123 S. Ct. 518, 527–29 (2002) (holding there was no conflict preemption even where the Coast Guard had decided not to adopt a regulation requiring propeller guards on motor boats). We hold that Appellants' common-law design defect claims relating to the Part 27 Bell 407 helicopter do not conflict with federal regulations concerning helicopter windshield design and bird-strike resistance. We overrule the remainder of Bell's first issue.

## IV. Panamanian Statute of Limitations

Bell contends in its sixth issue that because the accident occurred on January 27, 2000, and Appellants did not file this lawsuit until January 25, 2002, all of Appellants' claims are barred by the one-year Panamanian statute of limitations for negligence actions. Because Bell's sixth issue requires an interpretation of the Panamanian statute of limitations, we apply a de novo standard of review. *See Lal v. Harris Methodist Fort Worth*, 230 S.W.3d 468, 471 (Tex. App.—Fort Worth 2007, no pet.).

Under civil practice and remedies code section 71.031, foreign plaintiffs must commence their suits both within the time provided by Texas law and "within the time provided by the laws of the foreign state . . . in which the wrongful act, neglect, or default took place." Tex. Civ. Prac. & Rem. Code Ann. § 71.031(a)(2), (3) (West 2005); *see Owens Corning v. Carter*, 997 S.W.2d 560, 571 (Tex. 1999). "Thus, a foreign plaintiff whose cause of action for personal injury or wrongful death arose in a foreign state with a shorter limitations period than Texas's must file within the limitations period prescribed by that state's law." *Owens Corning*, 997 S.W.2d at 571–72.

The parties do not dispute that article 1706 of the Panamanian Civil Code sets forth the Panamanian statute of limitations governing negligence actions, nor do they seriously dispute the language of article 1706.[4] According to Bell's "Notice Regarding Panama Law," article 1706 states:

> The civil action seeking damages for slander or libel or civil liability derived from fault or negligence under article 1644 of the Civil Code, prescribes [that suit be filed within] a period of one year running from the time the claimant learned of the loss.

> If a criminal or administrative action for the facts described in the above paragraph is timely filed, the prescription of the civil action starts to run from the sentencing of the criminal or administrative action, as the case may be.[5]

---

[4]Bell and Appellants each filed a translated copy of article 1706. Although the translations differ slightly, the differences are not material to our analysis.

[5]Appellants' translation of article 1706 states:

20

Bell contends that because Appellants did not file suit within one year of the accident, Appellants' claims are barred by the statute of limitations. However, Appellants presented evidence of a criminal investigation that began on January 27, 2000, the day of the accident, and that ended in May 2002, several months after Appellants filed this lawsuit. Thus, under the plain language of article 1706, Appellants filed this lawsuit within the statute of limitations as set forth in the Panamanian Civil Code. We overrule Bell's sixth issue.

## V. Wrongful Death and Survival Claims

### A. Equitably Adopted Children

In their sixth issue, Appellants contend that the trial court erred by granting a partial summary judgment that Carla and Guillermo Gasperi, Gloria Gasperi's alleged equitably-adopted children, lacked standing to bring a

---

The civil action to claim indemnification for calumny or slander or to demand civil liability for the obligations derived from guilt or negligence referred to in Article 1644 of the Civil Code, prescribes within the term of one (1) year, counted from the date it came to the knowledge of the offended party.

If a criminal or administrative action is started opportunely for the facts foreseen in the above paragraph, the prescription of the civil action shall be counted from the execution of the criminal judgment or the administrative regulation, as the case may be.

wrongful death claim. Appellants do not contend that Gloria legally adopted Carla or Guillermo.[6]

"An action to recover damages [under the wrongful death statute] is for the exclusive benefit of the surviving spouse, children, and parents of the deceased." Tex. Civ. Prac. & Rem. Code Ann. § 71.004(a) (West 2005). In *Goss v. Franz*, the Amarillo court of appeals held that an alleged equitably-adopted child was not entitled to bring a wrongful death action. *See* 287 S.W.2d 289, 290 (Tex. Civ. App.—Amarillo 1956, writ ref'd). And in *Robinson v. Chiarello*, this court held that the appellants, who were "neither the natural parents nor legal adoptive parents" of the deceased, were barred as a matter of law from recovery under the wrongful death statute. 806 S.W.2d 304, 310–11 (Tex. App.—Fort Worth 1991, writ denied).

Appellants argue that the Texas Supreme Court "has not yet ruled on whether an equitably adopted child has standing to bring a claim under" the

---

[6]We review a summary judgment de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, disregarding evidence contrary to the nonmovant unless reasonable jurors could not, indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Id*.; *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *see* Tex. R. Civ. P. 166a(b), (c).

Wrongful Death Act, and they ask us to revisit our holding in *Robinson*. *See id.* at 310–11. We disagree with Appellants' contention that the supreme court has not yet addressed this issue, and we decline to accept Appellants' invitation to revisit precedent.

*Goss*, decided by the Amarillo Court of Appeals in 1956, is a "writ refused" case. *See* 287 S.W.2d at 290. "Writ refused" cases decided after 1927 have "'equal precedential value with the Texas Supreme Court's own opinions.'" *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 754 n.52 (Tex. 2006) (quoting The Greenbook: Texas Rules of Form (Tex. Law Review Ass'n, 10th ed. 2005)); *see also Yancy v. United Surgical Partners Int'l, Inc.*, 236 S.W.3d 778, 786 n.6 (Tex. 2007) (recognizing "writ refused" case "has the weight of our own precedent"). Thus, by refusing the writ in *Goss*, the supreme court essentially addressed the very issue Appellants present in this appeal. Therefore, *Goss*'s holding that an equitably-adopted child may not bring a wrongful death claim is binding precedent that we as an intermediate appellate court are obligated to follow. *See Lubbock Cnty., Tex. v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 585 (Tex. 2002) ("It is not the function of a court of appeals to abrogate or modify established precedent."). Because binding precedent holds contrary to Appellants' contention that Carla and Guillermo should have been permitted to

23

bring wrongful death claims as Gloria's equitably-adopted children, we overrule Appellants' sixth issue.

## B. Survival Claims on Behalf of Gloria's Estate

In its third issue, Bell contends that the representatives of Gloria's estate lacked capacity to bring a survival claim on behalf of the estate and that the survival claim is barred by the statute of limitations. Appellants respond that Bell failed to preserve its capacity challenge by not objecting to the jury charge and that the survival claim is not time-barred because Carla's post-limitations appointment as administratrix of Gloria's estate related back to Appellants' pre-limitations original petition.

### 1. Applicable Facts

Appellants filed this lawsuit on January 25, 2002, and Carla alleged in the original petition that she was a legal representative of Gloria's estate.[7] Bell filed a motion for summary judgment in April 2006, contending that the survival claim brought on behalf of Gloria's estate should be dismissed because Carla did not

---

[7] Guillermo also alleged in the original petition that he was a legal representative of Gloria's estate, but neither Bell nor Appellants address Guillermo's capacity to represent Gloria's estate. Thus, we do not address whether Guillermo was a legal representative of Gloria's estate or the timeliness of any claim Guillermo asserted on behalf of Gloria's estate.

24

have standing to assert it. The trial court initially took the issue under advisement but granted the motion for summary judgment after Bell filed a motion "re-urging" summary judgment on the survival claim. On August 8, 2007, Appellants filed a motion for reconsideration, and Carla filed an application in Tarrant County Probate Court to be appointed as the administrator of Gloria's estate. And on August 10, 2007, Appellants filed an amended petition that alleged Carla was a representative of Gloria's estate and that added Angela Lassen as a plaintiff as legal and personal representative of Gloria's estate. On August 19, 2007, the trial court granted Appellants' motion to reconsider the dismissal of the survival claim. On September 24, 2007, a week after the jury's verdict but before the trial court signed the judgment in this case, the Tarrant County Probate Court appointed Carla as administratrix of Gloria's estate.

## 2. Challenge to Capacity Not Preserved

Citing *Bossier Chrysler Dodge II, Inc. v. Rauschenberg*, Appellants argue that Bell did not preserve its challenge to the capacity of an estate representative because Bell did not object on capacity grounds to the jury charge questions concerning Gloria's estate.[8] *See* 201 S.W.3d 787, 798–99 (Tex. App.—Waco

---

[8]The jury charge asked the jury to determine whether the negligence, if any, of Bell, Captain Damian, Captain Garay, or Gloria caused Gloria's injuries and the sum of money that "would have fairly and reasonably compensated Gloria Gasperi" for pain and mental anguish. The jury charge does not contain a question, definition, or instruction concerning the capacity of any person to

25

2006, pet. granted), *rev'd in part on other grounds*, 238 S.W.3d 376 (Tex. 2007).

Bell does not dispute that it failed to object to the charge on capacity grounds but contends that capacity was a question of law that it preserved through its motion for judgment notwithstanding the verdict (JNOV).[9] Thus, we must determine whether Bell's challenge to capacity should have been raised through an objection to the jury charge or if it could be timely asserted for the first time in a post-verdict motion such as a motion for JNOV.

To preserve a no evidence or matter of law point for appeal, a party must raise the complaint through a motion for directed verdict, a motion for JNOV, an objection to the submission of the question to the jury, a motion to disregard the jury's answer to a vital fact question, or a motion for new trial. *See United Parcel Serv., Inc. v. Tasdemiroglu*, 25 S.W.3d 914, 916 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (citing *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex.1991)). But many legal rulings require timely objections before submission to the jury to preserve error for appeal. *See id.* at 916–17 (listing examples). And unlike standing, a challenge to a party's capacity can be waived if not properly challenged in the trial court. *See, e.g.*, *Austin Nursing Ctr., Inc. v. Lovato*, 171

represent Gloria's estate.

[9]Bell did object to the damages question assuming capacity but stated only that the survival claim "is barred by the Statute of Limitations, based on the late filing by Angela Lassen as the representative of the estate of Gloria Gasperi." Bell did not object to Carla or Angela's capacity to represent Gloria's estate.

S.W.3d 845, 849 (Tex. 2005) ("[A] challenge to a party's capacity must be raised by a verified pleading in the trial court.").

In *Osterberg v. Peca*, the supreme court stated that "if the trial court has 'to resolve a legal issue before the jury could properly perform its fact-finding role, . . . a party must lodge an objection in time for the trial court to make an appropriate ruling without having to order a new trial.'" 12 S.W.3d 31, 55 (Tex. 2000) (quoting *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999), and holding parties failed to preserve argument that they substantially complied with election code section 254.124 because they did not object to the jury charge). Relying in part on *Osterberg*, the court in *Bossier Chrysler Dodge* explained a defendant's obligations to preserve error when challenging the plaintiff's capacity:

> [I]f a verified denial is filed, the issue of the plaintiff's capacity to sue is controverted, and the plaintiff bears the burden of proving at trial that he is entitled to recover in the capacity in which he has filed suit. As the party with the burden of proof then, it is incumbent upon the plaintiff to obtain a jury finding on this particular issue.
>
> If, however, the trial court submits a question assuming the capacity originally pleaded . . . and the defendant does not object to the question, then the defendant is bound by that charge on appeal. Conversely, if the defendant does object, then the defendant will either obtain the sought-after jury finding or have an adverse ruling which can be reviewed on appeal.

201 S.W.3d at 798 (citing *Osterberg*, 12 S.W.3d at 55 and *O'Connor v. Miller*, 127 S.W.3d 249, 254 (Tex. App.—Waco 2003, pet. denied)). The *Bossier*

27

*Chrysler Dodge* court held that although the defendant properly controverted the plaintiff's capacity through a verified denial, the defendant did not preserve its capacity argument because it did not object to the jury charge. *Id.* at 798–99. And even though the defendant challenged the plaintiff's capacity in a motion for new trial, the court held that the challenge to the plaintiff's capacity through the motion for new trial "was not made in a timely fashion." *Id.* at 798.

Here, the jury charge included questions that assumed the capacity of the representative of Gloria's estate, and Bell did not object to the absence of any questions, definitions, or instructions on the issue of capacity.[10] Had Bell objected to the charge on capacity grounds, the trial court might have chosen to submit a question, definition, or instruction to the jury concerning capacity, thus permitting the jury to perform its fact-finding role on the controverted issue of capacity. *See Osterberg*, 12 S.W.3d at 55; *Clark v. Trailways, Inc.*, 774 S.W.2d 644, 647 (Tex. 1989) ("By failing to object . . . parties . . . effectively deny a trial court the opportunity to review and correct a prior finding."). By not objecting, Bell deprived the trial court of an opportunity to correct the alleged error relating to capacity. Thus, we hold that Bell failed to preserve for appellate review its

---

[10] In fact, although Bell submitted proposed questions, definitions, and instructions to the trial court, Bell's proposed questions, definitions, and instructions did not include any proposed questions, definitions, or instructions concerning the capacity of a representative of Gloria's estate.

28

challenge to the capacity of the representatives of Gloria's estate. We overrule this part of Bell's third issue.

### 3. Survival Claim Not Barred by Statute of Limitations

In the remainder of its third issue, Bell contends that the survival claim asserted on behalf of Gloria's estate is barred by the statute of limitations. Specifically, Bell contends that Carla's appointment as estate representative did not relate back to the original petition and that Angela did not join the lawsuit until seven years after the accident, meaning all claims on behalf of Gloria's estate are time-barred. Appellants respond that the claims on behalf of Gloria's estate are timely because Carla's post-limitations appointment as administratrix of Gloria's estate related back to the pre-limitations original petition.

In *Lovato*, the supreme court held that when a plaintiff's timely-filed original petition alleges her representative status to bring a survival claim and she acquires capacity to maintain the survival claim after the expiration of the statute of limitations, the "post-limitations capacity cures her pre-limitations lack thereof." 171 S.W.3d at 852–53. The court stated that "[g]enerally, cases involving post-limitations representative capacity involve an amended pleading alleging that capacity for the *first time*," but said that Lovato's "case is somewhat unusual, however, because Lovato has alleged representative status on behalf of the estate in every petition filed with the trial court." *Id*. at 852 (emphasis in original).

29

The court noted that Lovato's original assertion of representative status, "though apparently untrue, asserted that Lovato was bringing suit in her capacity as the estate's representative." *Id.* Deferring to the trial court on the issue of the reasonable inquiry made before filing the original petition, the court stated that "[t]he estate commenced the suit before limitations expired" and that "Lovato cured the defect in her capacity before the case was dismissed." *Id.* at 853. Therefore, the post-limitations acquisition of capacity cured the pre-limitations lack of capacity, and the statute of limitations did not bar the survival claim. *Id.*

Bell argues that *Lovato* is distinguishable because Lovato was actually an heir of the estate at the time of filing the original petition. We disagree. The supreme court specifically noted that Lovato's status as an heir of her mother's estate was in dispute. *Id.* at 848, 851. And the same day the supreme court decided *Lovato*, it held in *Lorentz v. Dunn* that the survival claim was not time-barred because the plaintiff, who was not an heir and did not have capacity to represent the estate at the time of filing the original petition, cured her pre-limitations lack of capacity through her post-limitations appointment as administrator of the estate.[11] 171 S.W.3d 854, 856 (Tex. 2005) (relying on *Lovato*, 171 S.W.3d at 850). Thus, we do not agree that Carla's alleged lack of

---

[11]Lorentz conceded in the court of appeals that she was not an heir of the estate. *See Lorentz v. Dunn*, 112 S.W.3d 176, 179 (Tex. App.—Fort Worth 2003, pet. granted), *rev'd*, 171 S.W.3d 845 (Tex. 2005) ("Appellant further concedes

status as an heir of Gloria's estate distinguishes *Lovato* from the present case. *See Lorentz*, 171 S.W.3d at 856; *Lovato*, 171 S.W.3d at 850.

We also disagree with Bell's assertion that *Lovato* is distinguishable because Carla "did not show due diligence in waiting five years to attempt to gain capacity" while Lovato "applied to become administrator just two months after filing the survival claim and within the statute of limitations, so the court held that her change of status was applied for *and completed within a reasonable time*." [Emphasis added.] There is no holding in *Lovato* that Lovato's appointment as administrator was "completed within a reasonable time." Instead, the supreme court stated, "If, as we have held, a plaintiff's amended pleading alleging representative capacity satisfies the relation-back requirements, an original petition that alleges the correct capacity should suffice for limitations purposes, provided that capacity, if challenged, is established within a reasonable time." *Lovato*, 171 S.W.3d at 853. And the footnote to that sentence states, "The burden is on the defendant to challenge capacity via verified plea, and the trial court should abate the case *and give the plaintiff a reasonable time to cure any defect*." *Id.* at 853 n.7 (emphasis added). Thus, the supreme court's reference to "a reasonable time" relates to the proper procedure following a timely plea in abatement and does not state that a plaintiff's ability to cure its pre-limitations

that she did not qualify as an heir to the estate.").

lack of capacity is contingent upon seeking capacity within a reasonable time of filing the original petition.[12] *See id.* at 853 & n.7. Indeed, Lovato was not appointed administrator until eighteen months after the expiration of the statute of limitations. *Id.* at 847, 852. Bell's attempt to distinguish *Lovato* is unpersuasive.

Bell also relies on *Covington v. Sisters of Charity of the Incarnate Word*. *See* 179 S.W.3d 583 (Tex. App.—Amarillo 2005, pet. denied). There, the decedent's daughter, Patricia Covington, was appointed administrator of the estate. *Id.* at 584. Later, and within the statute of limitations, the decedent's sister, Elizabeth Roberts, filed a medical malpractice claim. *Id.* After the defendants challenged Roberts's standing and capacity to act on behalf of her

---

[12]In this regard, we note that although Bell had the obligation to secure a jury finding on its limitations defense, Bell did not submit a proposed jury question inquiring whether a representative of Gloria's estate sought appointment as administrator within a reasonable time. *See Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988) ("The statute of limitations is an affirmative defense[, and t]he defendant thus bears the initial burden to plead, prove, and secure findings to sustain its plea of limitations.") (citing Tex. R. Civ. P. 94 and *Metal Structures Corp. v. Plains Textiles, Inc.*, 470 S.W.2d 93, 99 (Tex. Civ. App.—Amarillo 1971, writ ref'd n.r.e.). Thus, to the extent Bell contends that the survival claim is barred by the statute of limitations because an estate representative was not appointed administrator within a reasonable time, we overrule that portion of Bell's third issue because Bell did not preserve the argument for appellate review. *See* Tex. R. Civ. P. 278 ("Failure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment."); Tex. R. App. P. 33.1(a). Because the issue has not been preserved, we express no opinion as to whether an estate representative must acquire capacity to represent the estate within a reasonable time.

sister's estate, Roberts filed an amended petition that added Covington as a plaintiff, alleging that Covington was the administrator of the estate. *Id.* at 585. Affirming the trial court's summary judgment in favor of the defendants, the *Covington* court distinguished *Lovato* because Roberts was not an heir or personal representative of the estate and never pleaded or contended that she was an heir or personal representative of the estate. *Id.* at 587. The court further noted that the relation-back statute "does not directly address the filing of a subsequent pleading that adds a new plaintiff" and that "[o]rdinarily, an amended pleading adding a new party does not relate back to the original pleading." *Id.* at 588; *see* Tex. Civ. Prac. & Rem. Code Ann. § 16.068 (West 2005). The court held that because Covington was the administrator of the estate, Roberts did not have the capacity to bring a survival claim on behalf of the estate, and the post-limitations petition that added Covington as a party for the first time did not relate back to Roberts's pre-limitations petition. *Covington*, 179 S.W.3d at 587–88.

Unlike *Covington*, Carla filed this lawsuit within the limitations period, alleged that she was a representative of Gloria's estate, and subsequently acquired capacity to prosecute survival claims on behalf of Gloria's estate.[13]

---

[13]As discussed above, Bell failed to preserve the issue of whether Carla in fact had capacity to represent Gloria's estate by failing to object to the jury charge question assuming capacity.

Thus, Carla's post-limitations acquisition of capacity cured her alleged pre-limitations lack of capacity, and the survival claim on behalf of Gloria's estate is not barred by the statute of limitations. *See Lorentz*, 171 S.W.3d at 856; *Lovato*, 171 S.W.3d at 852–53.[14] And because Carla's post-limitations capacity cured her alleged pre-limitations lack of capacity, we need not decide whether Angela's intervention as a plaintiff in August 2007 related back to Carla's original petition or whether Carla had pre-limitations capacity to bring the survival claim as Gloria's alleged equitably-adopted daughter. *See* Tex. R. App. P. 47.1 (requiring appellate court to address "every issue raised and necessary to final disposition of the appeal"). We overrule the remainder of Bell's third issue.

## VI. Design Defects

Bell contends in its second, fourth, and fifth issues that, because Appellants' expert witnesses lacked necessary qualifications and their testimony was unreliable, conclusory, or speculative, there is no evidence to support the

---

[14]Bell also cites this court's opinion in *McAdams v. Capitol Products Corp.*, 810 S.W.2d 290 (Tex. App.—Fort Worth 1991, writ denied) (op. on reh'g) for the proposition that the survival claims are time-barred because Carla's acquisition of capacity did not relate back to her pre-limitations lack of capacity. *McAdams* was decided before *Lorentz* and *Lovato* and reached a contrary result. *See id.* at 293. And in *Lorentz*, the supreme court reversed this court's opinion that relied on *McAdams* as authority. *See Lorentz*, 171 S.W.3d at 854–56; *Lorentz*, 112 S.W.3d at 179. Because we are unable to distinguish *McAdams* from *Lorentz* and *Lovato*, we believe *McAdams* was implicitly overruled by *Lorentz* and *Lovato*. *Compare Lorentz*, 171 S.W.3d at 854–56, *and Lovato*, 171 S.W.3d at 846–47, 852–53 *with McAdams*, 810 S.W.2d at 291, 293.

34

jury's design defect findings.[15]   Specifically, Bell argues that there is no evidence

that the helicopter windshield or door mounts were defectively designed, that

there is no evidence that safer alternative designs were feasible for the

windshield or door mounts, and that there is "no evidence that [Appellants']

proposed alternative restraint system was available for use on civilian helicopters

and no evidence that it would have prevented Gloria Gasperi's injuries."

## A.   Applicable Law

To recover on their products liability claim alleging a design defect,

Appellants were required to prove by a preponderance of the evidence that "(1)

the product was defectively designed so as to render it unreasonably dangerous;

(2) a safer alternative design existed; and (3) the defect was a producing cause of

the injury for which the plaintiff seeks recovery."   *Timpte Indus., Inc. v. Gish*, 286

S.W.3d 306, 311 (Tex. 2009); *see Hernandez v. Tokai Corp.*, 2 S.W.3d 251,

255–56 (Tex. 1999); *Burry*, 203 S.W.3d at 529; *see also* Tex. Civ. Prac. & Rem.

Code Ann. § 82.005(a) (West 2011).   A "safer alternative design" is:

> a product design other than the one actually used that in reasonable
> probability:

---

[15]The trial court submitted a single, broad-form design defect question to the jury without differentiating between design defects in the helicopter's windshield, door mounts, or restraint system.

(1) would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility; and

(2) was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

Tex. Civ. Prac. & Rem. Code Ann. § 82.005(b).

## B.  Expert Testimony and Standard of Review

If an expert's testimony would assist the factfinder in understanding the evidence or determining a fact issue, that expert may testify on scientific, technical, or other specialized subjects.  Tex. R. Evid. 702; *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006).  Under Rule 702, the proponent of the expert's testimony has the burden to establish that the expert is qualified to render an opinion on the subject matter.  Tex. R. Evid. 702; *E.I. duPont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995).  Whether a witness is qualified is a matter of judicial discretion, and the trial court's determination on that issue will not be disturbed on appeal absent a clear abuse of that discretion.  *Robinson*, 923 S.W.2d at 558; *see Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996).  A trial court does not abuse its discretion merely because a reviewing court in the same circumstances would have ruled differently.  *Robinson*, 923 S.W.2d at 558; *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986).  The

36

trial court abuses its discretion if its decision was arbitrary or unreasonable without reference to guiding rules and principles. *Downer*, 701 S.W.2d at 241–42.

"[E]ach material part of an expert's theory must be reliable." *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009). When expert testimony is involved, courts are to "rigorously examine" both the validity of the facts and assumptions on which the testimony is based and "the manner in which the principles and methodologies are applied by the expert to reach the conclusions." *Id.* (citing *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002)). In doing so, we consider the expert's experience and the factors set forth by the supreme court in *Robinson*. *Id.* at 638 (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 720 (Tex. 1998)); *see Robinson*, 923 S.W.2d at 557.[16] "[I]n very few cases will the evidence be such that the trial court's reliability determination can properly be based only on the experience of a qualified expert to the exclusion of factors such as those set out in *Robinson*."

---

[16]The *Robinson* factors are (1) the extent to which the theory has been or can be tested, (2) the extent to which the technique relies upon the subjective interpretation of the expert, (3) whether the theory has been subjected to peer review or publication, (4) the technique's potential rate of error, (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community, and (6) the non-judicial uses which have been made of the theory or technique. 923 S.W.2d at 557.

*Whirlpool*, 298 S.W.3d at 638 (citing *Mack Trucks*, 206 S.W.3d at 579 and *Gammill*, 972 S.W.2d at 726).

Although a trial court's ruling on the reliability of an expert's opinion testimony is generally reviewed for an abuse of discretion, a party may assert on appeal, as Bell does in this case, that the unreliability of an expert's opinion makes it legally insufficient to support the verdict. *Id.* "[I]n a no-evidence review[,] we independently consider whether the evidence at trial would enable reasonable and fair-minded jurors to reach the verdict." *Id.* (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). This review "encompasses the entire record, including contrary evidence tending to show the expert opinion is incompetent or unreliable." *Id.*; *see also Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 804 (Tex. 2006) ("[W]e may consider the testimony of the[] opposing experts because 'an appellate court conducting a no-evidence review cannot consider only an expert's bare opinion, but must also consider contrary evidence showing it has no scientific basis.'") (quoting *City of Keller*, 168 S.W.3d at 813).

## C.  Helicopter Windshield

Bell argues in part of its second issue that there is no evidence of a safer alternative design for the helicopter windshield because the opinion testimony by Appellants' expert, Billy Hinds, was insufficient as a matter of law. Specifically,

38

Bell argues that Hinds lacked the necessary qualifications to testify about safer alternative designs because he has no experience designing helicopter structures and only limited experience with windshields on much larger helicopters, that his testimony is not based on sound engineering principles, and that his testimony is conclusory and speculative.

### 1. Preservation of Error

Appellants argue that Bell waived its challenge to the reliability of Hinds's testimony. "To preserve a complaint that an expert's testimony is unreliable, a party must object to the testimony before trial or when it is offered." *Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002); *see Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex. 1998). Bell filed a pretrial motion to strike Hinds's testimony that the trial court denied. In the pretrial motion, Bell invoked the *Robinson* factors and the *Gammill* analytical gap standard and argued that Hinds's testimony "is inherently unreliable and mere speculation." Bell's pretrial motion to strike Hinds's testimony preserved its challenge to the reliability of Hinds's testimony. *See Kraft*, 77 S.W.3d at 807; *Ellis*, 971 S.W.2d at 409; *see also City of Sugar Land v. Home & Hearth Sugarland, L.P.,* 215 S.W.3d 503, 511 n.4 (Tex. App.—Eastland 2007, pet. denied) (holding pretrial motion to exclude preserved appellate complaint concerning reliability of expert testimony). Further, Bell objected at trial to

39

Hinds's qualifications to testify about the structure of the Bell 407.  Finally, to the extent Bell contends that Hinds's testimony is speculative or conclusory on its face, no trial objection was required.  *See Coastal Transp. Co., v. Crown Cent. Petrol. Corp.*, 136 S.W.3d 227, 233 (Tex. 2004).  We therefore hold that Bell preserved its challenges to Hinds's qualifications and the reliability of his testimony.

### 2.  Hinds's Testimony

Hinds is an expert in bird-impact transparency design for aircraft.  He has extensive experience designing transparencies for airplanes, but he has no experience with light helicopters and limited experience with helicopters generally.  Specifically, Hinds has not been trained and has not performed work on the structural design of helicopters, has never designed how the structural frame of a helicopter (or any other aircraft) would accept a windshield or frame, has only designed transparencies for two large helicopters (the S-92 and the RAH-66), and has not done any work with light helicopters similar to the Bell 407.

### a.  Materials

Hinds testified that the as-cast acrylic used for the windshield in the Bell 407 was unreasonably dangerous and defectively designed because it was not bird-impact resistant.  He also testified that stretched acrylic and polycarbonate are safer materials and that the technology existed in 1997 to properly mate (or

40

attach) a 0.14 inch stretched acrylic or 0.1 inch polycarbonate windshield to the structure of the helicopter in order to resist an impact with a bird.

### b. "Mating" the Windshield to the Helicopter

Hinds testified that the mounting structure of the Bell 407 would need to be modified in order to mate a stretched acrylic or polycarbonate windshield to the helicopter and make it bird resistant. Concerning the modifications necessary for a 0.14 inch stretched acrylic windshield, Hinds testified that "[s]tretched acrylic has basically the same structure characteristics as the as-cast acrylic, and there probably wouldn't have had to be much change to the structure at all because of that." For a polycarbonate windshield, Hinds averred that because of the deflection in the polycarbonate windshield following a bird-strike, the portion of the helicopter frame that overlaps the windshield would have to be extended approximately 1.5 inches to keep the windshield retained in the structure. But Hinds acknowledged that he did not know if the helicopter structure would support a polycarbonate windshield in the event of a bird strike. He testified that the 1.5 inch change to the mating structure is an "approximation," that it is his "initial suggestion," that he "wasn't designing a window for Bell Helicopter," and that "without actually bird testing it and seeing how the edges perform in the actual bird testing, you don't really know for sure if the design is right."

### 3. Legal Sufficiency of Hinds's Opinion Testimony

41

Crucial to Hinds's safer alternative design opinions is his suggestion that either the 0.14 inch stretched acrylic or the 0.1 inch polycarbonate windshield could be successfully mated to the Bell 407—and retained to the helicopter in the event of a bird strike—by adding approximately 1.5 inches to the bonding area around the window frame. Two of Appellants' other experts, Anthony Bosik and John Raffo, agreed that an alternative design is not safer if it detaches from the helicopter following an impact, and Hinds agreed that it does not matter what material is used for the windshield if it does not prevent a bird from incapacitating the pilot. In other words, neither the stretched acrylic nor the polycarbonate design is safer than the as-cast acrylic design if they dislodge from the helicopter on impact with a bird. *See* Tex. Civ. Prac. & Rem. Code Ann. § 82.005(b)(1) (providing that alternative design must have "prevented or significantly reduced the risk" of the injury). Hinds agreed that in the event of a bird strike, there must be sufficient retention in the area where the windshield is bonded to the frame so that the bonding area is not overloaded by the deflection of the windshield caused by the impact. But Hinds never explained why his proposed addition of approximately 1.5 inches to the mating structure would be sufficient to retain a 0.14 inch stretched acrylic or 0.1 inch polycarbonate windshield on the helicopter in the event of a bird strike.

Concerning the frame alterations necessary to accommodate a 0.14 inch stretched acrylic windshield, Hinds testified that "there probably wouldn't have had to be much change to the structure," but he never explained the basis of his opinion. Other than saying that "[s]tretched acrylic has basically the same structure characteristics as the as-cast acrylic," Hinds did not say what, if any, structural changes are necessary, and if no changes are needed, he did not explain why none are needed. For a 0.1 inch polycarbonate windshield, Hinds testified that the overlap for the bonding area would need to be extended by approximately 1.5 inches because of the deflection rate of the polycarbonate, but he again failed to explain the basis of his opinion. For example, Hinds did not conduct or cite to any publications, engineering studies, or other analyses of the rigidity or deflection rates of a 0.14 inch stretched acrylic or 0.1 inch polycarbonate windshield as compared to the rigidity or deflection rates of the as-cast acrylic in the Bell 407 that support his opinion.

"Expert opinions must be supported by facts in evidence, not conjecture." *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 729 (Tex. 2003) (citing *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499–500 (Tex. 1995)). An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009) (quoting *Burrow v.*

43

*Arce*, 997 S.W.2d 229, 235 (Tex. 1999)); *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999). "[I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence." *Pollock*, 284 S.W.3d at 818; *cf. Burry*, 203 S.W.3d at 534–35 (holding that expert sufficiently explained how the proposed alternative safer design would function).

Assuming Hinds was qualified as an expert to testify regarding an alternative safer helicopter windshield design absent any training or experience in helicopter design, his testimony concerning the necessary changes to mate a 0.14 inch stretched acrylic or 0.1 inch polycarbonate windshield to the Bell 407 and resist a bird impact is conclusory, speculative, and no evidence that a 0.14 inch stretched acrylic or 0.1 inch polycarbonate windshield is a safer alternative design than the as-cast acrylic windshield on the Bell 407.[17] *See* Tex. Civ. Prac. & Rem. Code Ann. § 82.005(b); *Pollock*, 284 S.W.3d at 818; *Earle*, 998 S.W.2d at 890.

The conclusory and speculative nature of Hinds's testimony is illustrated by the testimony of other experts in the case and other parts of Hinds's testimony. *See Whirlpool*, 298 S.W.3d at 640–42 (considering evidence rebutting expert's

---

[17] Hinds acknowledged that he had only twelve weeks of training in structural design of aircraft and no training or experience in helicopter structural design.

opinion as evidence that "highlights the extent to which [the expert's] theory was subject to testing and examining for reliability"); *Cooper Tire*, 204 S.W.3d at 803–04 (considering testimony of opposing experts when reviewing scientific basis for expert's testimony); *Kraft*, 77 S.W.3d at 806–07 (considering expert's testimony during voir dire in analyzing reliability of the expert's opinion). All engineering experts who testified, even Hinds, agreed that designing the entire helicopter structure to withstand the load of an impact is a critical factor in designing a bird-resistant windshield.

Hinds acknowledged that whether his proposed 0.1 inch monolithic, polycarbonate windshield would work would require looking at how the whole frame fits with the supporting structure. Appellants' expert Bosik testified that designing the entire helicopter structure to withstand the load of an impact is a critical issue and that proving whether or not a bird will penetrate the material is only one of several steps in proving the existence of a safer alternative design. Appellants' expert Raffo, manager of a windshield manufacturer for all types of aircraft (including helicopters for Bell in the past), agreed that a safer alternative design of a windshield would require a complete structural design that would consider the structure of the helicopter because the force that is not taken up in the deflection of the windshield on impact will transfer to the structure of the helicopter.

45

In addition, Bell expert Warren Wandel, an accident investigator formerly with the National Transportation Safety Board, testified that of all civilian helicopters in the world, ninety-five percent are Part 27 helicopters (or the foreign equivalent) similar to the Bell 407; that Part 27 helicopters are popular and fit a certain niche because of their size, speed, weight, operating costs, and number of passengers; and that they are used extensively by law enforcement, pipeline and power line patrol, offshore support of the petroleum industry, and television and radio stations.[18]  Bell structural engineer Steven Webster testified that neither the materials nor the structure of light helicopters like the Bell 407 are designed for bird-impact resistance, polycarbonate is not synonymous with bird-impact resistance, and many efforts to use it over the years have been unsuccessful.  Webster further testified that the helicopter structure would have to be changed to withstand an impact of the magnitude that occurred here.  Finally, Bell structural engineer Alan Allman explained that a 3.5 pound bird striking a helicopter at 120 knots generates 2230 foot-pounds of force and reiterated that a polycarbonate windshield is not the same as a bird-resistant windshield.  He explained that the windshield is only one part of the system and agreed that even assuming the windshield material would resist the impact, the "major engineering portion" in designing a bird-resistant helicopter is building the

_____

[18]Other evidence estimated there are 1,000 Bell 407's in use in the United

entire structure of the helicopter around the bird-resistant transparency so that it will "withstand the load" created by the impact. Designing the helicopter to resist the 2230 foot-pounds of force would require additional weight to be added to the structure in the front and the rear, that the additional weight will require a larger engine with more horse-power, and that "by the time you build that entire structure[,] you now have a [Bell] 430 helicopter."[19]

Nevertheless, Hinds did not evaluate the impact of his proposal for an alternate design on the rest of the Bell 407's structural design. Although Hinds agreed that a windshield design must consider how the windshield and its frame fit with the helicopter's supporting structure, he admitted that he did not do so in this case. Indeed, he admitted that he does not have any experience with helicopter design, and he testified that he only looked at available technology for the makeup of the windshield and admitted that he could not answer structural

---

States.

[19]The Bell 430 is a medium-weight helicopter with a maximum gross-weight of 8,400 pounds compared to the maximum gross-weight of 5,500 pounds for the Bell 407. The Bell 430 is bird resistant, and Allman testified that Bell did not design the Bell 407 to be bird resistant because doing so "[t]urns [it] into a 430," that Bell is "taking a light helicopter and making it smoother and faster, better for the performance," and that Bell is "not designing another bird-strike 430." *See Brockert v. Wyeth Pharm., Inc.*, 287 S.W.3d 760, 770 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("The Texas Supreme Court has held that a plaintiff cannot prove design defect by claiming that [a] defendant should have sold an entirely different product.") (citing *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 384–85 (Tex. 1995)).

47

questions about the Bell 407. Hinds also agreed during his voir dire examination outside the presence of the jury that a bird impact will transfer loads from the windshield to the structure of the helicopter, but he admitted that he did not calculate the loads transferred to the frame and did not know what the loads would do to the frame. Hinds's failure to analyze the structure of the Bell 407 or to even calculate the load transferred to the structure following a bird strike is a significant gap in his analysis, *see generally Gammill*, 972 S.W.2d at 727, and it illuminates the conclusory and speculative nature of his testimony that a stretched acrylic or polycarbonate windshield could be retained to the Bell 407 after a bird strike by adding approximately 1.5 inches to the bonding area.

Other deficiencies in Hinds's testimony further illustrate the conclusory and speculative nature of his opinions. Hinds testified on voir dire that the structures of helicopters and airplanes are very similar, stating that the fundamental design principles for any aircraft are basically the same; that they must "take landing and takeoff loads"; that they must "take air pressure loads"; that you must "calculate the strength of the materials, the joint interfaces[,] and how they react"; that "you have to worry about how these loads are going to take pressure"; and that these are "basic engineering principles." In *Volkswagon of America, Inc. v. Ramirez*, the challenged expert testified his accident reconstruction opinions involved application of "basic scientific and engineering principles, but all abiding by the

48

laws of physics," but the expert had not read publications or seen studies that corroborated his opinion, did not conduct or cite any tests to support his theory, and did not explain how the tests he did conduct supported his conclusions. 159 S.W.3d 897, 905–06 (Tex. 2004). Holding that the expert's opinion was unreliable and thus no evidence, the supreme court stated that the expert's "reliance on the 'laws of physics,' without more, is an insufficient explanation." *Id.* at 906. Here, although Hinds testified that his opinions are based on basic engineering principles, he never explained how those principles or any tests or publications supported his opinion that a stretched acrylic or polycarbonate windshield could be successfully mated to the Bell 407 and make it bird resistant by adding approximately 1.5 inches to the bonding area.

Hinds's opinions also differ from those he employs in non-litigation contexts. Hinds testified that his proposed stretched acrylic or polycarbonate windshield designs would be bonded to the helicopter, but he admitted that all of the transparencies his company makes are bolted to the aircraft and that he has no experience designing transparencies for light helicopters. Thus, Hinds does not have non-judicial experience with his proposed design or anything similar. *See Robinson*, 923 S.W.2d at 557 n.2 ("That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science.")

(quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (op. on remand)).  Indeed, all of Hinds's opinions were developed for the litigation in this case.  Hinds testified that he believes every helicopter is unreasonably dangerous if it cannot sustain a four-pound bird strike at full cruising speed but acknowledged that he did not hold that opinion before this litigation.[20]  Moreover, despite his litigation opinions, Hinds testified that his company delivered a 2.2 pound bird-resistant windshield for the Sikorsky S-92 while this litigation was pending and after he was hired as an expert.  Thus, his opinions have no non-judicial application and differ from those he practices in non-judicial settings.  *See id.* at 557.

As to relevant testing of his theory, Hinds testified that he has not tested a 0.1 inch monolithic polycarbonate windshield in any aircraft,[21] that he does not know if anyone else has, and that he is not aware of any helicopters in existence that use a monolithic polycarbonate transparency.  An expert is not always required to do testing to support his opinions, "but lack of relevant testing to the

---

[20]Hinds further opined that he thinks the entire industry knew that birds were a serious problem and that the manufacturers of helicopters as well as the government were negligent in ignoring the danger of bird strikes, but he has published no papers on the subject nor encouraged the FAA or the industry to accept his opinions.

[21]Hinds testified that he has tested eighth-inch polycarbonate windshields, but he admitted they are twenty-five percent thicker, are not monolithic, and are actually much thicker than an eighth-inch considering the other layers.

50

extent it was possible, either by the expert or others, is one factor that points toward a determination that an expert opinion is unreliable." *Whirlpool*, 298 S.W.3d at 642. Hinds testified that although his theory has not been tested, he knows that his design will work because he has the necessary knowledge and experience and because many of the other transparencies he has designed had not been designed before. *But see Ramirez*, 159 S.W.3d at 904–06 (holding that expert's theory rested on his "subjective interpretation of the facts" when he did not connect his theory to any physical evidence in the case or to any tests or calculations prepared to substantiate his theory).

Citing *General Motors Corp. v. Sanchez*, Appellants argue that they presented legally sufficient evidence of a safer alternative design because "there is no requirement that a plaintiff actually design or build or test the alternative." *See* 997 S.W.2d 584, 592 (Tex. 1999).[22] But *Sanchez* is distinguishable. The *Sanchez* Court's statement about testing related to a plaintiff's burden to show the existence of a safer alternative design and did not concern the *Robinson* factors or their application to the reliability of the expert's opinion testimony. *Id*. at 591–92. Indeed, G.M. failed in that case to preserve its challenge to the reliability of the expert's testimony. *Id.* at 591.

---

[22]The *Sanchez* court stated, "[T]he plaintiffs did not have to build and test an automobile transmission to prove a safer alternative design. A design need only prove 'capable of being developed.'" *Id.* at 592.

Unlike in *Sanchez*, Bell preserved its challenge to the reliability of Hinds's testimony. Further, unlike the expert in *Sanchez*, Hinds did not disclose any testing, calculations, engineering analysis, or publications that supported his opinion that adding approximately 1.5 inches to the bonding area would retain a 0.14 inch stretched acrylic or 0.1 inch polycarbonate windshield to the Bell 407 after a bird strike.[23] The absence of Hinds's underlying analysis and the availability of testing "highlights the extent to which [Hinds's] theory was subject to testing and examining for reliability." *Whirlpool*, 298 S.W.3d at 642.

In summary, Hinds's testimony does not link his conclusions to the facts of the case or the analysis, if any, that he performed to determine that either a 0.14 inch stretched acrylic or 0.1 inch polycarbonate windshield could be successfully mated to the Bell 407 by adding 1.5 inches to the mounting structure. His theory relies heavily upon his own subjective interpretation, has not been generally accepted within the relevant aircraft community, does not have any non-judicial

---

[23]Relying on *Sanchez* and other similar opinions, the dissent asserts that our holding that Hinds's testimony is conclusory and speculative is "premised on the erroneous premise that Hinds was required to build and to test a prototype windshield." Dissent at 3 n.1. To the contrary, we merely hold that Hinds, as an expert witness, was required to explain his conclusions and link them to the facts of the case or the analysis he conducted to support his opinion. We reference the many other deficiencies in Hinds's testimony only to illuminate the conclusory and speculative nature of his testimony that a 0.1 inch polycarbonate or 0.14 inch stretched acrylic windshield could be successfully mated to a Bell 407—and make it resistant to a 3.5 to four pound bird traveling at 120 knots—by adding 1.5 inches to the mating structure around the windshield.

52

uses, could have been tested but was not, and differs from what he employs outside of litigation. *See id.* at 640–43 (holding expert's testimony conclusory, speculative, and not entitled to probative weight after applying *Robinson* factors); *Coastal Transp. Co.*, 136 S.W.3d at 231–33 (holding expert's testimony was too conclusory to support a judgment). We hold that Hinds's testimony that either a stretched acrylic or polycarbonate windshield could be mated to the Bell 407 by adding 1.5 inches to the helicopter frame is conclusory, speculative, and not entitled to probative weight. *See Whirlpool*, 298 S.W.3d at 643. Therefore, Hinds's testimony is no evidence of a safer alternative design.

### 4. Other Evidence of Safer Alternative Design

Having determined that Hinds's testimony concerning a safer alternative design is not entitled to probative weight, we must determine whether Appellants offered other legally sufficient evidence of a safer alternative design.

Appellants argue that they presented sufficient evidence that a monolithic polycarbonate windshield was feasible at the time of manufacture in 1997 because they offered evidence that "the Aerospatiale AS-350, which like the Bell 407 is a Part 27 helicopter with a similar windshield design to the Bell 407, was offered with a monolithic, single-layer polycarbonate windshield in 1977." First, there is no evidence in the record that the monolithic polycarbonate windshield on the AS-350 was resistant to a 3.5 pound bird strike or would remain attached to

the helicopter following a 3.5 pound bird strike. *See* Tex. Civ. Prac. & Rem. Code Ann. § 82.005(b)(1) (providing that alternative design must have "prevented or significantly reduced the risk" of the injury); *see also Smith v. Louisville Ladder Co.*, 237 F.3d 515, 519–20 (5th Cir. 2001) (applying Texas law and holding safer alternative design not proven when expert could not say that alternative design would have prevented the plaintiff's fall). Moreover, Aerospatiale abandoned the polycarbonate windshields in the AS-350 because of the polycarbonate's reaction to cleaning agents, and current models of the AS-350 have as-cast acrylic windshields similar to those in the Bell 407. *See* Tex. Civ. Prac. & Rem. Code Ann. § 82.005(b)(2) (providing that safer alternative design must be technologically feasible). Further, Appellants presented no evidence of the costs of incorporating the AS-350 design into the Bell 407. *See Honda of Am. Mfg., Inc. v. Norman*, 104 S.W.3d 600, 607 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).[24] Without evidence concerning the cost of incorporating the AS-350 design into the Bell 407, there is no evidence of the economic feasibility of the

---

[24]The *Norman* court stated,

> While the use of an alternative design by another manufacturer may establish technological feasibility, . . . as a matter of law, it does not establish economic feasibility. . . . Evidence of use in the marketplace alone is not sufficient to establish economic feasibility under Texas law. To establish economic feasibility, the plaintiff must introduce proof of the cost of incorporating this technology.

54

AS-350 design. *See id.*; *Smith v. Aqua-Flo, Inc.*, 23 S.W.3d 473, 478 (Tex. App.—Houston [1st Dist.] 2000, pet. denied); *Jaimes v. Fiesta Mart, Inc.*, 21 S.W.3d 301, 306 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). Thus, the existence of the AS-350 is no evidence of a safer alternative design for the Bell 407 as it relates to the facts of this case.

Appellants also argue that they presented evidence of feasibility because Bell currently has a prototype Bell 407 with polycarbonate windshields. But the prototype Bell 407 was developed after the accident helicopter was manufactured in 1997, and it has not been tested for bird resistance. Indeed, there was testimony at trial that, even at the time of trial in September 2007, no helicopter manufacturers were building Part 27 helicopters like the Bell 407 with polycarbonate windshields and that no helicopter manufacturers were building Part 27 helicopters with any kind of bird-resistant or bird-proof windshields. Without evidence that the prototype helicopter is actually bird resistant, the existence of a prototype with polycarbonate windshields, first developed after the accident helicopter was manufactured in 1997, is no evidence of a technologically feasible safer alternative design at the time of manufacture that would reduce the

_____

*Id.* (internal citations omitted).

55

risk of injury.[25]   *See* Tex. Civ. Prac. & Rem. Code Ann. § 82.005(b)(1); *see also Smith*, 237 F.3d at 519–20.

Finally, Appellants point to evidence that Bell produced the bird-resistant Bell 222 in the 1980's because the United Kingdom required all helicopters at the time to be bird-resistant.  However, the Bell 222 was a Part 29 helicopter and was only resistant to a 2.2 pound bird strike.  The Bell 407 is a Part 27 helicopter, and the bird involved in this accident weighed substantially more than 2.2 pounds.  Thus, the existence of the Bell 222 is no evidence of a safer alternative design for the Bell 407.[26]   *See* Tex. Civ. Prac. & Rem. Code Ann.

---

[25]Similarly, and as the dissent points out, Bell built two helicopters about the size of the Bell 407 for the military—with either polycarbonate or stretched acrylic windshields—in 1997 or 1998.  *See* Dissent, at 8–9 n.3.  However, there is no evidence of whether the military helicopters were capable of resisting a 3.5 to four pound bird like the one involved in this case or whether they were resistant to only a 2.2 pound bird (like all of the other bird-resistant helicopters discussed at trial).  Further, there is no evidence of the thickness of the military helicopter windshields or of their design (such as monolithic or multi-layer) to determine whether they are at all comparable to the alternative designs proposed by the Appellants in this case.

[26]The dissent points to the Bell 222, the Bell 609, and the Bell UH-1 as evidence of a safer alternative design, but none of these helicopters is remotely comparable to the Bell 407.  *See* Dissent, at 8–9 n.3.  The Bell 222 is a 10,000 to 13,000-pound Part 29 helicopter, with a windshield that is "shaped entirely different than the 407," that is installed with bolts rather than adhesive, and that was only resistant to a 2.2 pound bird rather than a bird in excess of 3.5 pounds.  Allan Allman testified that comparing the Bell 430 (the current version of the Bell 222) to the Bell 407 is like "comparing a grape to an orange."

The Bell 609 is a tilt-rotor aircraft—both an airplane and a helicopter—similar to the V-22 Osprey.  Its windshield is multi-ply and 0.75 inches

56

§ 82.005(b)(2); *Smith*, 237 F.3d at 519–20; *see also Brockert*, 287 S.W.3d at 770 (citing *Shears*, 911 S.W.2d at 384–85).

Absent competent expert testimony as to whether it was feasible in 1997 to mount a 0.1 inch polycarbonate or 0.14 inch stretched acrylic windshield to a Bell 407 so that the windshield would both resist a 3.5 pound bird and also not become dislodged from the helicopter, Appellants presented no evidence of a safer alternative design for the windshield on the Bell 407 that would have sustained an impact with a 3.5 pound bird and prevented or significantly reduced the risk of injury to Appellants. We therefore sustain this part of Bell's second issue.[27]

## D. Helicopter Door Mounts

---

thick, including at least one outer ply of 0.1 inch glass and two layers of 0.25 inch polycarbonate, and it is more than seven times the thickness of the 0.1 inch polycarbonate design proposed by the Appellants. Similarly, the UH-1 is three times larger than the 407, its structure is "made totally different" than the 407, and its polycarbonate windshield is 0.25 inches, two and one-half times the thickness of the polycarbonate design proposed by the Appellants.

Allman testified that these large helicopters are "in a different category" and that looking at them as alternative designs "would be something like taking the front end off your 250 Ford truck and put[ting] it on a Honda Civic." As discussed above, the Appellants cannot successfully prove the existence of a safer alternative design by offering evidence that Bell should have built an entirely different product. *See Brockert*, 287 S.W.3d at 770 (citing *Shears*, 911 S.W.2d at 384–85).

[27]We need not address, and express no opinion concerning, the remainder of Bell's second issue. *See* Tex. R. App. P. 47.1.

Bell contends in its fifth issue that there is no evidence that the door mounts on the helicopter were defectively designed or that a safer alternative design existed because the only evidence Appellants presented was "textbook speculation or conjecture."

Ross, Appellants' accident reconstruction expert, testified that he examined the wreckage of a Bell 206 and that the Bell 407 is a derivative of the Bell 206. Ross testified that the wrecked Bell 206 he examined was in about the same condition as the wrecked Bell 407 in this case, that the sides of the Bell 206 were made of aluminum, that the sides of the Bell 407 were made of a carbon-fiber material, that the doors of the Bell 206 did not come off in its crash, but that the doors of the Bell 407 came off in the instant crash. However, Ross never testified that the Bell 407 was defectively designed because its sides were made of carbon-fiber material. Further, although Ross implicitly suggested that the aluminum construction of the Bell 206 was a safer design, he did not explain why the aluminum is a safer design, provide any details concerning the crash of the Bell 206 to explain why the doors remained on that helicopter, or give any reason the doors of the Bell 407 would have remained on the helicopter had its sides been constructed of aluminum. Therefore, Ross's testimony is conclusory and no evidence that the door mounts on the Bell 407 were defectively designed or that there was an available safer alternative design. *See Coastal Transp. Co.,*

58

136 S.W.3d at 231–33 (holding expert's testimony was too conclusory to support a judgment).

Appellants incorrectly contend that Bell waived its complaint concerning the sufficiency of Ross's testimony. "[W]hen a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis." *Id.* at 233. "However, when the challenge is restricted to the face of the record, for example, when expert testimony is speculative or conclusory on its face, then a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility." *Id.* Here, Bell's challenge does not concern Ross's methodology, technique, or foundational data. Instead, Bell argues that Ross's testimony is conclusory and speculative on its face. No objection was required to preserve the no evidence issue for appellate review. *See id.* We sustain Bell's fifth issue.

## E. Helicopter Restraint System

Bell argues in its fourth issue that the trial court erred by submitting the design defect claim concerning the helicopter restraint system to the jury because there is no evidence that Appellants' proposed alternative restraint system was

available for use on civil helicopters or that the proposed alternative restraint system would have prevented or significantly reduced Gloria's injuries.

### 1. Commercial Availability

Bell contends that Appellants did not meet their burden of proving that the MA-16, Appellants' proposed safer alternative design, and its underlying technology were available for use at the time the Bell 407 was manufactured in 1997 because Appellants' seatbelt expert, William Muzzy, "undertook no analysis of whether the design could have passed the rigorous FAA testing and certification procedure[] so that it could have actually been installed on the aircraft." Bell also argues that Appellants "made no showing that the MA-16 or its underlying technology would be approved for use by the State Department" under the International Trafficking in Arms Regulations (ITAR). However, Bell cites no authority to support its contentions, and we find none.

Contrary to Bell's assertion, section 82.005(b) does not require proof that the proposed safer alternative design would have gained regulatory approval. *See* Tex. Civ. Prac. & Rem. Code Ann. § 82.005(b). Instead, section 82.005(b) requires proof that the safer alternative design "was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge." *Id.* To adopt Bell's contention that a claimant must prove that the

60

proposed alternative design would have been approved by the relevant regulatory agencies would be tantamount to adding an additional element to a claimant's design defect cause of action, and we decline to do so. *See Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 565 (Tex. App.—Austin 2004, no pet.) ("As an intermediate appellate court, we are not free to mold Texas law as we see fit but must instead follow the precedents of the Texas Supreme Court unless and until the high court overrules them or the Texas Legislature supersedes them by statute."). We therefore overrule this portion of Bell's fourth issue.

### 2. Prevent or Significantly Reduce Risk of Injury

Bell also argues that there is no evidence that the MA-16 was a safer alternative design because Muzzy never explained how the MA-16 would have prevented or significantly reduced the risk of Gloria's injuries.

Muzzy testified that the MA-16 was a safer alternative design to the restraint system in the Bell 407 because the MA-16 has an omni-directional sensing retractor and the Bell 407's movements after impact were omni-directional. Muzzy explained that the MA-16 is a "dual-sensing omnidirectional retractor" that incorporates both vehicle sensing and web sensing technology and that the Bell 407 restraint system had only web sensing technology. He testified that web sensing locks the seatbelt when the seatbelt is pulled forward rapidly but that the seatbelt will unlock when the tension on the

61

seatbelt is released.  In contrast, vehicle sensing locks the seatbelt when the helicopter is accelerated in any direction.  Muzzy testified that the MA-16 would have prevented Gloria from moving outside the helicopter because it has omni-directional dual sensing.

Using the animation of the crash sequence, Muzzy demonstrated each of the times that Gloria's restraint would have locked and then unlocked.  Muzzy testified that even though Gloria had her seatbelt on, she was partially ejected from the helicopter during the crash sequence because the locking and unlocking in the restraint system allowed the seatbelt to continually extend to the point where it did not restrain her in her seat or even inside the helicopter.  He testified that the restraint system worked as it was designed but that it should have been designed so that it would not lock and unlock.

Again using the animation of the crash sequence, Muzzy testified that the helicopter's movements during the crash sequence were omni-directional because "[y]ou have a force down, you have forces laterally and you have deceleration forces forward.  So you have them in all three directions."  He averred that "the lack of an omni-directional vehicle sensing retractor . . . in the aircraft was the proximate cause of [Gloria] being ejected and [her] subsequent death."  Muzzy's testimony is not conclusory and presented more than a scintilla of evidence that the proposed safer alternative design would have prevented or

62

significantly reduced the risk of Gloria's death. *See Burry*, 203 S.W.3d at 535–36 (holding that expert "sufficiently explained the basis for his testimony" and that there was more than a scintilla of evidence of a safer alternative design). We therefore overrule the remainder of Bell's fourth issue.

## VII.  Comparative Responsibility

Appellants contend in their fifth issue that the evidence is legally and factually insufficient to support the jury's finding that Captain Damian's comparative negligence caused fifty percent of the Appellants' injuries.

### A. Standards of Review

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). Anything more than a scintilla of evidence is legally sufficient to support the

finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller*, 168 S.W.3d at 807, 827.

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *In re King's Estate*, 150

64

Tex. 662, 244 S.W.2d 660, 661 (1951).  Factual sufficiency issues depend on

who has the burden of proof at trial.  *See Gooch v. Am. Sling Co.*, 902 S.W.2d

181, 184 (Tex. App.—Fort Worth 1995, no writ).  When the party with the burden

of proof appeals from a failure to find, the party must show that the failure to find

is against the great weight and preponderance of the evidence.  *Cropper v.

Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988); *see Herbert v. Herbert*,

754 S.W.2d 141, 144 (Tex. 1988).

## B.  Analysis

Ross, Appellants' helicopter pilot expert, testified that the helicopter was

flying at 120 knots forward air speed and at 1,500 feet above sea level when

Captain Damian made a five-degree course correction to avoid the flock of birds

sighted in the distance.  Ross said that he had no criticisms of the five-degree

course correction because the pilots acknowledged the birds and made a move

to avoid the pack of birds.  Ross explained that the five-degree course correction

would have moved the helicopter away from the birds at a distance of

three-and-one-half rotor lengths and that he believed this was sufficient because

the helicopter moved past the flock of birds.[28]  Based on Captain Garay's

---

[28]The jury heard conflicting testimony about the single bird separated from the flock of birds.  For example, Captain Garay acknowledged that he never mentioned the flock of birds in his written statement to Panamanian authorities, and Lorenzo testified that he heard the pilots refer to the flock of birds but admitted that he did not mention the flock of birds during his deposition testimony.

testimony, Ross stated that he believed the helicopter moved past the flock of birds because the bird did not come from the main pack, that it approached the helicopter from above, and that it approached quickly, giving the pilots only fractions of a second to try to avoid it. Ross averred that Captains Damian and Garay were not negligent, that they did all they could to save the helicopter and its passengers, and that they did not proximately cause the accident.

Ross admitted on cross-examination, however, that Captain Garay's written statement to Panamanian investigators twenty days after the accident mentioned only a single bird and did not mention a flock of birds.[29] Ross also acknowledged that a pilot wants to do all he can to avoid a mid-air collision with a bird, especially a bird the size of the one that struck the helicopter. He testified that seeing birds ahead would alert him to think of a potential mid-air collision and that he would act to avoid a collision. Ross agreed that the pilots could have turned the helicopter sharply or hovered after seeing the birds thirty to sixty seconds away at 120 knots. He also agreed that Captain Damian could have turned the helicopter thirty or forty-five degrees and significantly increased the helicopter's distance from the birds, that two ninety-degree turns would have added less than one minute to the overall flight time, and that there was no

---

[29]Ross also agreed that a hypothetical animation based on Captain Garay's written statement would look nothing like the animation that Ross prepared to explain his opinions to the jury.

reason Captain Damian could not have made two ninety-degree turns. Ross also acknowledged that a vulture can fly up to 900 feet in thirty seconds and that a five-degree course correction would not alter the helicopter's course 900 feet. In addition, Ross agreed that a pilot does not know what a bird will do, so the pilot should err on the side of caution in attempting to avoid a collision. Moreover, in response to a hypothetical question, Ross testified that he would place some fault on the pilots if they saw a hang-glider thirty to sixty seconds away but failed to avoid the hang-glider after making only a five-degree course correction. Finally, Ross agreed that a more aggressive evasive action by the pilots in this case would have avoided the mid-air collision.

The jury also heard testimony from Warren Wandel, Bell's pilot expert, concerning comparative negligence by Captain Damian. Wandel testified that ninety percent of bird strikes occur below 2000 feet, that eighty-three percent of bird strikes occur below 1500 feet, that flying closer to the ground increases the chances of a bird strike, and that an important avoidance technique is to fly the aircraft "at the highest altitude you can." Wandel also listed other considerations for avoiding bird strikes, including charting flight plans to avoid known bird concentration areas and reducing speed when operating in areas of bird activity. He also testified that, even assuming there was a single bird flying away from the flock of birds, Captain Damian should have made a more drastic course

67

correction after seeing the flock of birds and that doing so would have avoided the accident. We conclude that the evidence is legally and factually sufficient to support the jury's finding that Captain Damian was negligent. *See Cent. Ready Mix Concrete Co.*, 228 S.W.3d at 651; *City of Keller*, 168 S.W.3d at 807, 827; *Pool*, 715 S.W.2d at 635; *Garza*, 395 S.W.2d at 823; *King's Estate*, 244 S.W.2d at 661.

Concerning the jury's apportionment of fifty percent responsibility to Captain Damian, the "jury is given wide latitude in performing its sworn duty to serve as factfinder in allocating responsibility for an accident pursuant to section 33.003 of the civil practice and remedies code." *Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 659 (Tex. App.—Dallas 2002, pet. denied). In *Rosell*, despite conflicting evidence, the court affirmed the factual sufficiency of the evidence supporting the jury's apportionment of seventy percent responsibility to the claimant for causing his own injuries when he stopped to help an injured motorist on the side of the road, moved into the lane of an approaching bus, was warned of the bus, but did not take evasive action. *Id.* Similarly, in *Hagins v. E-Z Mart Stores, Inc.*, a case involving a fatal fall by a construction worker, the court affirmed the jury's apportionment of sixty percent responsibility to the decedent because the evidence demonstrated that it was unsafe to use a platform while positioned at an angle, that the decedent decided not to attempt to

68

place the platform flush against the wall, and that the decedent knew the hazards of working above the ground without a safety harness. *See* 128 S.W.3d 383, 392 (Tex. App.—Texarkana 2004, no pet.). Given the conflicting evidence presented to the jury, including but not limited to the testimony that the accident would not have occurred had Captain Damian taken more aggressive evasive action, we conclude that the evidence is legally and factually sufficient to support the jury's apportionment of fifty percent responsibility to Captain Damian. "[I]t is not the place of this Court to substitute its judgment for that of the jury, even if a different percentage of allocation could be supported by the evidence." *Id.* (citing *Rosell*, 89 S.W.3d at 659–60).

Based on the foregoing, and after reviewing all of the evidence in the light favorable to the jury's findings, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not, we hold that there is legally sufficient evidence to support the jury's findings that Captain Damian was comparatively negligent and that his negligence caused fifty percent of Appellants' injuries. *See Cent. Ready Mix Concrete Co.*, 228 S.W.3d at 651; *City of Keller*, 168 S.W.3d at 807, 827. Likewise, after considering and weighing all of the evidence pertinent to the jury's findings, we cannot say that the evidence supporting the jury's findings is so weak or contrary to the overwhelming weight of all the evidence that it should be

set aside and a new trial ordered. *See Pool*, 715 S.W.2d at 635; *Garza*, 395 S.W.2d at 823; *King's Estate*, 244 S.W.2d at 661. We therefore overrule Appellants' fifth issue.

### VIII.    Mental Anguish Damages

Appellants contend in their fourth issue that the trial court erred by failing to order a new trial because the damages awarded by the jury are "so against the great weight and preponderance of the evidence as to be manifestly unjust." Because of our disposition of Bell's second, fourth, and fifth issues, we address only the jury's award of $50,000 in mental anguish damages to Gloria's estate. *See* Tex. R. App. P. 47.1.

Appellate briefs must contain appropriate citations to the record. *See* Tex. R. App. P. 38.1(i). And bare assertions of error without proper citation to the record waive error. *See Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (appellate court has discretion to waive point of error due to inadequate briefing); *Devine v. Dallas Cnty.*, 130 S.W.3d 512, 513–14 (Tex. App.—Dallas 2004, no pet.) (holding that when a party fails to adequately brief a complaint, he waives the issue on appeal). Although Appellants devote eight pages of their brief to their contention that the jury's damage awards are against the great weight and preponderance of the evidence, Appellants' brief does not cite any portion of the record to support their assertion

70

that the $50,000 in mental anguish damages awarded to Gloria's estate are so against the great weight and preponderance of the evidence to be manifestly unjust. And although Appellants included the damages awarded to Gloria's estate in the recitation of their fourth issue, the remainder of Appellants' briefing concerning damages never again mentions the $50,000 awarded to Gloria's estate for mental anguish. Because Appellants' assertion that the damages awarded to Gloria's estate are against the great weight and preponderance of the evidence is not supported by record references or citation to legal authority, they have failed to preserve this issue for appellate review. *See* Tex. R. App. P. 38.1(i); *Fredonia State Bank*, 881 S.W.2d at 284; *Devine*, 130 S.W.3d at 513–14. We overrule Appellants' fourth issue.

## IX. Alleged Jury Misconduct

Appellants contend in their first two issues that the trial court erred by failing to accept juror affidavits for filing, failing to conduct an open hearing concerning allegations that the jury traded-off answers on the jury charge, and failing to grant a new trial due to alleged jury misconduct. Appellants argue in their third issue that if Texas law prohibits inquiry into the alleged jury misconduct in this case, then the prohibition violates the open-courts provision of the Texas constitution and the Fifth and Fourteenth Amendments to the United States Constitution. Bell responds that we should overrule Appellants' first three issues

71

because rule of civil procedure 327(b) and rule of evidence 606(b) prohibit juror testimony concerning any matter or statement occurring during deliberations other than matters related to outside influence.  *See* Tex. R. Civ. P. 327(b); Tex. R. Evid. 606(b).

## A.   Traded Answers

Rule of civil procedure 327(b) states:

> A juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict concerning his mental processes in connection therewith, except that a juror may testify whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

Tex. R. Civ. P. 327(b).   Rule of evidence 606(b) sets forth a virtually identical prohibition against jury testimony concerning any matter other than outside influence.   Tex. R. Evid. 606(b).

Appellants argue that the trial court should have accepted the juror affidavits and conducted an open hearing to receive juror testimony because the jury's alleged "trading-off" of answers was an overt act of the jurors and did not involve any juror's mental processes.   Appellants also contend that an overt act is governed by rule 327(a), which permits evidence of jury misconduct, rather than rule 327(b), which prohibits juror testimony concerning deliberations.

72

*Compare* Tex. R. Civ. P. 327(a), *with* Tex. R. Civ. P. 327(b).  In *Golden Eagle Archery, Inc. v. Jackson*, the supreme court stated:

> Most Texas courts considering the question have held that the rules prevent a juror from testifying that the jury discussed improper matters during deliberation.  We agree.  The rules contemplate that an "outside influence" originates from sources other than the jurors themselves.  Accordingly, here the accounts that some jurors speculated whether alcohol was involved in the accident and that Jackson may have received a settlement, *or that the jurors traded answers on two issues*, are all juror statements about matters occurring during their deliberations.  They are not evidence of outside influences.

24 S.W.3d 362, 370 (Tex. 2000) (internal citations omitted) (emphasis added).

Applying *Golden Eagle Archery* to this case, juror testimony that they traded answers is not evidence of an outside influence.  *See id.*  Thus, civil procedure rule 327(b) and rule of evidence 606(b) prohibited the trial court from receiving juror affidavits or other juror testimony concerning alleged traded answers.  *See* Tex. R. Civ. P. 327(b); Tex. R. Evid. 606(b); *Golden Eagle Archery*, 24 S.W.3d at 370; *see also Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 666 (Tex. 2009) ("[D]iscovery involving jurors should ordinarily be limited to facts and evidence relevant to (1) whether any outside influence was improperly brought to bear upon any juror, and (2) rebuttal of a claim that a juror was not qualified to serve.").

Appellants cite several cases for the proposition that "the trading of answers and the cluster answering are of such severity and obvious harm that a

73

new trial must be granted."[30]  However, each case cited by Appellants was decided before the effective dates of the current rule of procedure 327(b) and rule of evidence 606(b).  *See Robinson Elec. Supply Co. v. Cadillac Cable Corp.*, 706 S.W.2d 130, 131–32 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.), *overruled on other grounds by*, *Golden Eagle Archery*, 24 S.W.3d at 369 & n.3 (noting effective date of rules and stating, "Under former Rule 327(b), effective until April 1, 1984, a juror was permitted to testify as to matters and statements, or 'overt acts', which occurred during deliberations.").  Therefore, we are bound by the language of rules 327(b) and 606(b) that prohibits juror testimony concerning any matter other than outside influence and the supreme court's holding in *Golden Eagle Archery* that alleged trading answers by the jury is not an outside influence.  *See* Tex. R. Civ. P. 327(b); Tex. R. Evid. 606(b); *Golden Eagle Archery*, 24 S.W.3d at 370.  And we decline to adopt a rule, as suggested by Appellants, that inquiry into jury deliberations is permissible if there is prima facie evidence of jury misconduct during deliberations other than an outside influence.  We overrule Appellants' first and second issues.

## B.  Constitutional Arguments

---

[30] *See generally Strange v. Treasure City*, 608 S.W.2d 604 (Tex. 1980); *Monkey Grip Rubber Co. v. Walton*, 122 Tex. 185, 53 S.W.2d 770 (Tex. 1932); *Landreth v. Reed*, 570 S.W.2d 486 (Tex. Civ. App.—Texarkana 1978, no writ); *Crawford v. Consol. Underwriters*, 323 S.W.2d 657 (Tex. Civ. App.—Beaumont 1959, writ ref'd n.r.e.).

Appellants contend in their third issue that the prohibition against juror testimony concerning the "trading-off" of answers violates their rights to due process and equal protection under the United States Constitution and to due process, a jury trial, and open courts under the Texas constitution. *See* U. S. Const. amends. V, XIV, § 1; Tex. Const. art. I, §§ 13, 15, 19.

In *Golden Eagle Archery*, the appellant argued that rule 327(b) "conflicts with the guarantees of the right to a fair and impartial jury trial" in article I, sections 10 and 15 of the Texas constitution. 24 S.W.3d at 374. Rejecting the argument, the court discussed with approval two cases from the Corpus Christi court of appeals that collectively held that rules 327(b) and 606(b) do not violate due process under the Fourteenth Amendment or the Texas constitution, the right to a fair and impartial jury under the Texas constitution, or the open courts provision of the Texas constitution. *Id.*; *see Soliz v. Saenz*, 779 S.W.2d 929, 934–35 (Tex. App.—Corpus Christi 1989, writ denied); *King v. Bauer*, 767 S.W.2d 197, 199 (Tex. App.—Corpus Christi 1989, writ denied). We follow *Golden Eagle*, *Soliz*, and *King* and hold that rules 327(b) and 606(b) do not violate Appellants' rights under the United States Constitution or the Texas constitution.[31] We overrule Appellants' third issue.

---

[31]To the extent Appellants contend rules 327(b) and 606(b) violate the equal protection clause of the Fourteenth Amendment, we overrule that portion of Appellants' third point as inadequately briefed. *See* Tex. R. App. P. 38.1(i)

## X.  Conclusion

Because we have overruled each of Appellants' six issues, sustainedpart of Bell's second issue and all of its fifth issue, and overruled the remainder of Bell's issues, we affirm the portion of the trial court's judgment relating to the claims on behalf of Gloria Gasperi's estate.   We reverse the remainder of the trial court's judgment, and we render judgment that Appellants Lourdes Maria Vargas de Damian, individually, as next friend to Nicole Denisse Damian Vargas, and as representative of the estate of Demetrio Damian Chen, deceased; Ricardo Adolfo Garay Barrios; Lorenzo Romagosa Acrich; and Ida Romagosa de Aranjo take nothing.


              ANNE GARDNER
              JUSTICE

PANEL:   DAUPHINOT, GARDNER, and WALKER, JJ.

WALKER, J. filed a concurring and dissenting opinion.

DELIVERED:   August 31, 2011

---

(requiring brief to contain a clear and concise argument for the contentions made with appropriate citations to authorities).


| | |
|---|---|
| LOURDES MARIA VARGAS DE DAMIAN, INDIVIDUALLY, AS NEXT FRIEND TO NICOLE DENISSE DAMIAN VARGAS, AND AS REPRESENTATIVE OF THE ESTATE OF DEMETRIO DAMIAN CHEN, DECEASED; GUILLERMO JOSE GASPERI, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF GLORIA GASPERI, DECEASED; CARLA GASPERI, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF GLORIA GASPERI, DECEASED; ANGELA CECILIA LASSEN DE GASPERI, AS LEGAL AND PERSONAL REPRESENTATIVE OF THE ESTATE OF GLORIA GASPERI; RICARDO ADOLFO GARAY BARRIOS; LORENZO ROMAGOSA ACRICH; AND IDA ROMAGOSA DE ARANJO | APPELLANTS AND APPELLEES |

V.

| | |
|---|---|
| BELL HELICOPTER TEXTRON, INC. | APPELLEE AND APPELLANT |

1

----------

----------

# CONCURRING AND DISSENTING OPINION

----------

## I.  INTRODUCTION

In its second issue, Appellee Bell Helicopter Textron, Inc. argues that the trial court erred by submitting question 6, the design defect question, to the jury. Specifically, Bell claims, and the Majority Opinion holds, that Bill Hinds's testimony is the only evidence in the record that a safer alternative windshield design was feasible in 1997 when the Bell 407 helicopter at issue was manufactured.  I cannot agree that Hinds's testimony is the only evidence supporting the feasibility of the safer alternative design element of the windshield design defect claim asserted against Bell by Appellants.  Even excluding Hinds's testimony, the remainder of the testimony and the evidence in the fifty-nine volumes of the reporter's record contains more than a scintilla of evidence that a safer alternative design—either a 0.14-inch stretched acrylic windshield or a 0.10-inch monolithic polycarbonate windshield—was technologically and economically feasible in 1997, that the safer alternative design would have significantly reduced the risk that the black vulture would have penetrated the

2

helicopter's windshield intact and killed Captain Damian, and that use of the safer alternative design windshield would not have substantially impaired the Bell 407's utility.1  Accordingly, I dissent.  I concur with the remainder of the Majority's Opinion.

---

1I also disagree with the Majority Opinion's holdings that Hinds was not qualified to testify concerning a safer alternative windshield design and that his opinions were speculative and conclusory or not based on sound engineering principles.  All of these holdings by the majority are premised on the erroneous premise that Hinds was required to build and to test a prototype windshield.  But no requirement exists, however, that an expert in a design defect case have actually designed and built the available safer alternative design in order to be qualified to testify to a safer alternative design.  *See Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 592 (Tex. 1999) (holding expert qualified to testify to safer alternative design, upholding jury finding of design defect, recognizing that expert was qualified to testify concerning safer alternative design, and stating that "the plaintiffs did not have to build and test an automobile transmission to prove a safer alternative design"); *Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 527 (Tex. App.—Fort Worth 2006, pet. denied, pet. abated) (rejecting contentions that expert in design defect case was not qualified because he "'last worked in the automotive industry over twenty years ago and has no experience with side airbags'" and "'never ran a crash test with side impact airbags, never designed a side impact airbag, never designed a vehicle with side impact airbags, and never wrote any papers about side impact airbags'"); *see also MCI Sales & Serv., Inc. v. Hinton*, 272 S.W.3d 17, 30–31 (Tex. App.—Waco 2008) (same, also holding "the Plaintiffs did not have to build and test a prototype to prove a safer alternative design"), *aff'd*, 329 S.W.3d 475 (Tex. 2010), *cert. denied*, 131 S. Ct. 2903 (2011).  Indeed, the Majority Opinion holds that Hinds's testimony constitutes no evidence specifically because it was not based on testing of a 0.14-inch stretched acrylic windshield or a 0.10-inch monolithic polycarbonate windshield in a Bell 407.  But I do not address these issues because, even excluding Hinds's testimony, more than a scintilla of evidence exists concerning the safer alternative windshield design element of question 6 so that the trial court

## II. EVEN DISREGARDING HINDS'S TESTIMONY, LEGALLY SUFFICIENT EVIDENCE EXISTS TO SUPPORT SUBMISSION OF QUESTION 6 TO THE JURY

### A. Standard of Review

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

### B. The Court's Charge

Question number 6 submitted the following question to the jury:

---

did not err by submitting the question to the jury.

4

QUESTION NO. 6:

Was there a design defect in the helicopter at the time it left the possession of Bell Helicopter Textron, Inc. that was a producing cause of the injuries in question?

A "design defect" is a condition of the product that renders it unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. For a design defect to exist there must have been a safer alternative design.

"Safer alternative design" means a product design other than the one actually used that in reasonable probability—

1. would have prevented or significantly reduced the risk of the occurrence in question without substantially impairing the product's utility and

2. was economically and technologically feasible at the time the product left the control of Bell Helicopter Textron, Inc. by the application of existing or reasonably achievable scientific knowledge.

Answer "Yes" or "No."

Answer:   [the jury answered, "yes"]

## C.   Other Testimony and Evidence in the Record

The crash at issue occurred when a 3.5- to 4-pound black vulture hit the 0.10-inch as-cast acrylic windshield of a Bell 407 helicopter being flown by Captain Damian. All experts agreed that the maximum speed that the Bell 407 could have been traveling at the time of the bird strike was 120 knots. The bird penetrated the helicopter's windshield, making a hole in it, and entered the cockpit intact. Several pictures of the bird and the helicopter's windshield were offered into evidence; they showed the bird intact and a hole straight through the helicopter's as-cast acrylic windshield. The bird struck Captain Damian in the

5

head and either killed him or caused him to lose consciousness so that he slumped over the helicopter's controls.

In its second issue, Bell claims that Hinds's testimony is the only evidence in the record that a safer alternative windshield design was technologically and economically feasible in 1997 when the Bell 407 was manufactured. Bell claims that neither of Hinds's proposed safer alternative designs—a 0.14-inch stretched acrylic windshield or a 0.10-inch monolithic polycarbonate windshield—were technologically feasible (1) because the stretched acrylic windshield was too heavy to be used in a light, Part 27 helicopter like the Bell 407; (2) because insertion of a 0.10-inch monolithic polycarbonate windshield into a Bell 407 would require "hundreds and hundreds" of pounds of structure to be added to support the polycarbonate windshield; and (3) because a 0.10-inch monolithic polycarbonate windshield would not stay in the windshield frame in the event of a bird strike but instead would push through the frame into the cockpit.

As set forth below, even excluding Hinds's testimony, more than a scintilla of evidence exists proving each of the vital facts necessary to support the safer alternative design element of the windshield design defect claim submitted to the jury in question 6.

### 1. Technological Feasibility

The jury's finding that a safer alternative windshield design—a 0.14-inch stretched acrylic bird-impact resistant windshield or a 0.10-inch monolithic

6

polycarbonate bird-impact resistant windshield—existed in 1997 when the Bell 407 at issue was manufactured is supported by the evidence set forth below. Most importantly, prior to 1997, *Bell itself* manufactured bird-impact resistant windshields for some of its helicopters.2   Bell's manufacture of bird-impact

---

2 Tom Gailey—Bell's expert on the structure of the Bell 407, a Bell employee who had worked for Bell for twenty-three years at the time of trial—testified that in the early 1980s, Bell manufactured and sold Bell 222 helicopters with bird-impact resistant windshields in the United Kingdom because, at that time, the UK required bird-impact resistant windshields.  Gailey testified that he was not sure if the Bell 222 bird-impact resistant windshield was polycarbonate; "it may have been."  Since 1975, European regulations have required bird-impact resistant windshields on helicopters weighing 6,000 pounds or more; the Bell 407 weighs 5,500 pounds.

Steven Webster, Bell's director of advanced technologies and processes, testified that Bell began manufacturing the Bell 222 with the heated bird-proof window assemblies in 1976 for sale in Europe but did not put that windshield in the Bell 222s being sold in the U.S.

Gailey testified that Bell had also manufactured a bird-impact resistant windshield for the Bell 609; it was a "two-ply polycarbonate with an adhesive – it[']s called PVB adhesive—between the two plies of polycarbonate.  And then there's a ply of tenth-inch glass on the outside, and it also has a layer of adhesive between it and the outer layer of polycarbonate."  The polycarbonate layers of the Bell 609 are each approximately one-fourth-inch thick, that is, 0.25 inches thick.  The entire bird-impact resistant windshield for the Bell 609 is 0.75 inches thick and weighs approximately thirty pounds per side of the front windshield.

Webster testified that in the 1970s, Bell also manufactured a UH-1 helicopter with a 0.25-inch monolithic polycarbonate windshield.

Steven Scott Cline, a project engineer who had worked for Bell for twenty-eight years at the time of trial, testified that in 1997 and 1998, Bell was manufacturing bird-impact resistant windshields for military helicopters.  The windshields were made of stretched acrylic with a hard coating applied.

7

resistant windshields prior to 1997 is some evidence that it was technologically feasible for Bell to manufacture a bird-resistant windshield in 1997 for the Bell 407 by the application of existing or reasonably achievable scientific knowledge that Bell itself possessed.

Although Bell asserted at trial that polycarbonate windshields were not technologically feasible because they suffered from clarity and durability issues, Bell developed a coating via a study it concluded in 1994 that eliminated all of the clarity and durability issues Bell had encountered with polycarbonate windshields.3 And coating a windshield does not add appreciably to the thickness

---

3Webster testified extensively about the results of an "Abrasion Resistant Canopies" study (ARC study) that Bell had conducted and concluded in 1994. The study worked with coatings for windshields and documented Bell's discovery of a coating for polycarbonate that addressed the UV protection issues, the rain shedding issues, the chemical resistance issues, and the scratching issues sometimes encountered with the use of polycarbonate windshields. Webster testified:

Q. Okay. In your ARC study in '94, which was three years before this Bell 407 was manufactured, you determined that you had coatings that would enhance UV protection, rain shedding, chemical resistance and protection against scratching, didn't you?

A. Yes.

Q. And that included the coated polycarbonate, correct?

A. Yes.

Q. Okay. So in '94, you had a coating that you could put on, including polycarbonate, that was satisfactory to you in dealing with these problems, didn't you?

of the windshield; "[t]he coating is very thin one mil. It's within tolerance of the structural ply, so the coating -- if you coat a polycarbonate ply, it does not increase the thickness appreciably."

Although Bell asserted at trial that neither of the proposed safer alternative windshields—a 0.14-inch stretched acrylic bird-impact resistant windshield nor a 0.10-inch monolithic polycarbonate bird-impact resistant windshield—were technologically feasible because they weighed too much, testimony and evidence

---

A. It addressed all those problems, yeah, trying to make it better.

Q. Three years -- three years before -- because those are your only criticisms of polycarbonate. So y'all had that solved in '94, three years before this helicopter that two of these people's family members died in was manufactured, correct?

. . . .

A. This technology was available for many years.

Q. My point is, you had a satisfactory coating that solved the criticisms you had for polycarbonate three years before this aircraft was manufactured that these people crashed in, correct?

A. It addressed those issues, yes.

Q. Okay. So now all that's left is, would the polycarbonate have stopped the bird or not, correct?

A. I'm – I'm not – I'm not going – I can't answer those questions for you –

was adduced that neither of the safer alternative design windshields are much heavier than the 0.10-inch as-cast acrylic windshield that was in the Bell 407.4

---

John Raffo, Appellants' coatings expert, identified several different coatings for polycarbonate that were available prior to 1997 and would have worked well on a 0.10-inch polycarbonate windshield for the Bell 407.

4According to Bell's expert Dr. Gary Thompson, the bird-impact resistant windshield that Bell placed in the Bell 222 in 1976 weighed twenty-six pounds, only eighteen pounds heavier than the existing as-cast acrylic windshield in the Bell 407.

Concerning the weight of polycarbonate, one of Appellants' experts Anthony Bosik, an aeronautical engineer and principal in Bosik Consultants Limited, the company that operates the National Research Council bird cannon, testified:

> Q. Briefly, let's talk about the different weights between the materials, the substance. This is still – we're still in the 1976 report [the 1976 report prepared for the U.S. Army was admitted into evidence as Plaintiffs' Exhibit 104]. What would be your response to the criticism that polycarbonate is much weightier and would be much heavier?
>
> A. It is not, it is just slightly heavier.
>
> Q. Okay?
>
> A. As one can see, 12.7 versus 13.8.
>
> Q. And this was known back in at least since 1976, and has everyone really kind of known that all along?
>
> A. Yes.

The 1976 report prepared for the U.S. Army contains the following abstract:

> Bird impact results graphically demonstrated that the polycarbonate prototype provided the superior resistance, i.e., resistance to bird strikes at speeds up to 120 knots while the standard acrylic

10

Although Bell asserted at trial that installation of the safer alternative design of a 0.10-inch monolithic polycarbonate bird-impact resistant windshield was not technologically feasible because it would require the addition of "hundreds and hundreds" of pounds of structure to the Bell 407 to support the windshield, after the accident at issue here, Bell in fact did install a 0.10-inch monolithic polycarbonate bird-impact resistant windshield in a Bell 407. Absolutely no structural changes were made to the Bell 407 prior to installing the 0.10-inch monolithic polycarbonate windshield,5 and certainly not the addition of "hundreds

windshield was incapable of defeating a bird strike at the UH-1 [a Bell helicopter] cruising speed of 90 knots.

In general, the superior mechanical properties and the flight worthiness of the coated polycarbonate configuration have been demonstrated.

5Webster testified that once Bell started working on it in 1999, they formed the Bell 407 polycarbonate bird-impact resistant windshield in about two months. Allan Allman, a staff engineer who had worked for Bell for a total of thirty-eight years at the time of trial, testified that in 1999, Bell had installed a 0.10-inch monolithic polycarbonate windshield in a Bell 407 and admitted that there were no structural changes to the Bell 407 prior to installation of the polycarbonate windshield.

Gailey also testified that since the accident at issue in this case, Bell had manufactured a Bell 407 with a polycarbonate windshield and that it had not required any changes to the structure of the helicopter.

Webster testified:

Q. Well, we've heard in this case about, well, if you want to put a polycarbonate in a light helicopter you've got all these structural issues. Tell me what structural changes were made in the 407 that

11

and hundreds of pounds of structure."6

_____

the military is flying around with right now with a polycarbonate windshield in it?

A.   Mr. Fisher, I can't answer that.

Q.   You can't?

A.   No, sir.

Q.   But do you – assume with me that that's one of the issues in this case, that's been made in this case, is you can't put polycarbonate in these things because it might come out of the structure.   It might – if it stops the bird, the whole windshield is going to come out, you're going to have to change the whole structure.

A.   Not necessarily.

     . . . .

Q.   But my point is this:   And that is, you can't tell the jury that any structural changes had to be made to the 407 to put the polycarbonate windshield in it, can you?

A.   There were no structural changes made to the OH-58D or the 407 in trying to put a polycarbonate windshield in it.

6Concerning the structural changes allegedly necessary to the Bell 407 to support a bird-impact resistant windshield, Allman testified:

> If you want to be able to take this load [a bird-impact resistant windshield in a Bell 407] you've got to get it back to the middle. You've got to take all the energy – they call it sheering out.   So what you do is you add a bunch of weight, which I have never calculated – and as I said in my deposition hundreds and hundreds of pounds.   I don't know the exact weight and – it's a lot.   Anyway, you take whatever that weight is, and you put it here.   And then you have to get that so it will support that bird windshield so it will be bird proof.

Webster intimated that the structure of the Bell 407 would have to be "beefed up" if the existing 0.10-inch as-cast acrylic windshield were replaced with

## 2. Economic Feasibility

Several witnesses testified that both a monolithic polycarbonate windshield and a stretched acrylic windshield were economically feasible in prior to 1997.[7]

## 3. Either of the Safer Alternative Design Windshields Would Have Significantly Reduced the Risk of the Occurrence in Question

Had the Bell 407 been equipped with either of the safer alternative design bird-impact resistant windshields—either a 0.10-inch monolithic polycarbonate windshield or a 0.14-inch stretched acrylic windshield, instead of the 0.10-inch as-cast acrylic windshield it did possess—in reasonable probability, the vulture would either have not come through the windshield or would have been liquefied or broken into pieces so that Captain Damian was not killed.[8] Polycarbonate is

---

a 0.10-inch monolithic polycarbonate windshield, but he could not say what structure needed to be "beefed up."

[7]Raffo testified that a polycarbonate windshield could have been made as early as the 1970s; a monolithic polycarbonate replacement windshield for the Bell 407 could have been manufactured by Sierracin for approximately $2,000 to $3,000. Raffo testified that the cost of as-cast acrylic [the material used in the Bell 407 helicopter's windshield] and polycarbonate are "roughly similar in costs." Bosik testified that "polycarbonate and as-cast acrylic are both the same costs." Webster testified that although Bell did "nothing" to develop a polycarbonate windshield in the Bell 407 from 1976–1994, "cost was not a factor" in Bell's decision, "[e]specially on something as inexpensive as a polycarbonate product."

[8]Dr. Warren Wandel, Bell's accident reconstruction expert, agreed that it was undisputed and that Bell's experts agreed that had a 0.10-inch polycarbonate windshield been in the Bell 407 at issue, the windshield would not have broken when impacted by the vulture.

more bird-impact resistant than as-cast acrylic because it is more flexible and absorbs more energy.9   Stretched acrylic is more bird-impact resistant than as-cast acrylic because heating and stretching the acrylic causes the cross-linking molecules to line up and results in a more impact-resistant material.10   A 0.10-inch stretched acrylic windshield would have significantly reduced the risk of the occurrence in question, and a 0.14-inch stretched acrylic windshield would have prevented the vulture from penetrating the windshield intact.11

---

9Bosik testified that "polycarbonate is able to absorb a lot more impact, because it is more flexible.  It deforms more during the impact and is therefore able to absorb more of the energy than, let's say, the acrylic."  Bosik opined that polycarbonate transparencies are substantially more resistant to bird impact than as-cast acrylic transparencies; "for a bolted edge situation the polycarbonate gives you about three times the impact resistance of as-cast acrylic," and for a clamped edge situation, the impact resistance of a polycarbonate frame is even significantly higher.

Raffo testified that "[p]olycarbonate is the most impact-resistant plastic polymer that is used in aircraft transparencies.  It's efficient because it has a good impact resistance at a thin thickness, which means that the weight is reduced."  Polycarbonate windshields were used in the F-16 starting in the mid-1970s.

10Raffo testified that "[f]rom an impact point of view, as-cast acrylic is the least resistant material.  Stretched acrylic would be the next strongest material, and polycarbonate would be the ultimate."

11Bosik testified that in 1978, he published a study on bird impacts on monolithic aircraft windshields where he tested the velocity necessary for a bird to penetrate as-cast acrylic, stretched acrylic, and polycarbonate windshields.  His study was introduced into evidence as Plaintiffs' Exhibit 98.  Based on the tests he conducted, in the late 1970s Bosik participated in the development of a mathematical equation to predict penetration velocity of these materials based on the thickness of the material and the weight of the bird being fired at it.  Bosik

read from a 1976 report that the U.S. Army had produced concerning tests it had done on the Bell UH-1 helicopter and that it had provided to Bell in 1976. The report concluded that "[b]ird impact results graphically demonstrated that the polycarbonate prototype provided the superior resistance." Based on the Army's tests in 1976 and Bosik's mathematical equation, a 0.10-inch polycarbonate windshield would have defeated a 120-knot strike by a four-pound bird.

Concerning whether a stretched acrylic windshield design or a polycarbonate windshield design would have in reasonable probability prevented the approximately four-pound vulture from penetrating the windshield of the Bell 407, traveling at a maximum speed of 120 knots in such a way that it struck and killed Captain Damian or knocked him unconscious, Bosik testified:

Q. And what did you conclude with respect to the penetration velocity of either stretched acrylic or polycarbonate in this particular accident?

A. Basically the stretched acrylic in the same thickness probably could have survived [a] 100 knot test. But stretched acrylic is a feasible material as well as far as the windshield goes. The thickness would have to be increased a little bit from what it is, to an estimated .14 inches.

Q. So for stretched acrylic they'd only have to go from .1 to .14?

A. For polycarbonate a .1 inch thick, which is the same thickness, would increase the penetration velocity from about 60 or 70 to about 200 knots.

Q. So for the polycarbonate material, as far as the thickness that we see here with respect to the windshield, it – it could have been the same size?

A. Yes.

Q. And that was feasible at the time this helicopter was manufactured?

A. Yes.

15

Although Bell asserted at trial that a 0.10-inch monolithic polycarbonate windshield would not have prevented the occurrence in question because, according to Bell, the windshield would have pushed through its frame into the cockpit of the helicopter, Bell based this assertion on non-bird-strike testing that the jury could have found flawed and disbelieved.12   The non-bird-strike testing

---

12Allman, one of Bell's staff engineers, was asked what would happen if a polycarbonate windshield was placed in a Bell 407, a bird hit it, and the polycarbonate did absorb the energy and prevent the bird from penetrating the windshield.   He answered:

> A.   If you put a large enough polycarbonate window and mount it on the Bell structure so that the bird's energy will be absorbed, that energy that it absorbs is past the point that the structure can handle and it will buckle, then the windshield will break loose, because the structure is given away underneath the load of the windshield.
>
> Q.   So windshield structure buckles and windshield breaks loose; is that fair?
>
> A.   Yes, sir.
>
> Q.   Okay.   Now, tell the jury every test that you've run, every equation you've done, every bird Bell's fired, you or Bell has fired at a tenth of an inch polycarbonate windshield in a 407 structure.
>
> A.   Mr. Webster answered that, and my answer will be the same.   Is we have not done any bird-strike tests.
>
>       . . . .
>
> Q.   So wouldn't you agree, sir, that – that you or Bell have performed no tests, done no studies, done no experiments to support the opinions that you're giving today that the windshield will come out?

16

that Bell did perform in preparation for this litigation involved dropping fifty pounds of lead from a crane onto a square piece of 0.10-inch monolithic polycarbonate mounted in a wooden frame. 13     And even Bell's non-bird-strike testing

A.   We have done no tests on the 407 to support that opinion.

13Bosik testified regarding Bell's testing in preparation for this litigation. He explained that to form its opinion that a 0.10-inch polycarbonate windshield would not stay in the windshield frame following a bird strike, Bell mated a polycarbonate square to a square frame made of wood, hoisted a fifty-pound lead weight up by a crane, and dropped it on the framed polycarbonate.   The piece of polycarbonate stayed intact but was pushed down through the wooden frame holding it.   Bosik explained that the load Bell used to do this test was improper because the lead "in no way simulates a bird. . . .   Because the consistency of it is not correct. . . .   For a first approximation of a bird, you would assume a liquid, as opposed to a solid.   So a bird is more like an orange than an apple."   Bosik said that Bell did not perform the testing to ASTM's standards for bird impact testing "because they should be using a bird or a simulated bird and that should be conducted at the right speed.   In addition to that, it should be a representative of structure and it should be conducted at the right attitude; that is, the same flight path as the aircraft would be."   Additionally, Bell's testing utilized a wooden frame, rather than the steel-type frames used in the Bell 407 and also no evidence exists that the mating with the wooden box utilized an extra 1.5 inch interface as required by Hinds's design.   Consequently, Bosik concluded, "I don't think this test has any validity whatsoever."

Dr. Gary Thompson testified for Bell that the bird in this case hit the Bell 407 with 2230 foot pounds of energy.   He said that amount of energy is what Bell was trying to replicate in its testing by dropping fifty pounds of lead on a square of polycarbonate.   Dr. Thompson testified:

Q.   You're from east Texas.   Did you ever hit lovebugs on your windshield?

A.   Yes, I have.

Q.   When you hit them on your windshield, which way does the bug shoot up?   Which way did the starburst of the bug happen?

17

constituted some evidence that a 0.10-inch monolithic polycarbonate windshield would not have shattered upon impact with the 3.5- to 4-pound vulture—since it did not shatter upon impact with fifty pounds of lead traveling at the same or greater velocity as the vulture and in a more dangerous, downward angle of attack than the vulture.

### 4. Use of a Safer Alternative Design Windshield Would Not Impair the Bell 407's Utility

In 1999, after only two months of work, Bell produced and installed a 0.10-inch monolithic polycarbonate windshield in a Bell 407 for a company called

---

A. Typically goes up with the air flow.

Q. It doesn't stay intact, obviously, right?

A. Most bugs will not, no.

Q. Because bugs are partially liquid, right?

A. Yes.

Q. Like a bird?

A. Yes.

Q. How much liquid is in that 3.5 pound vulture?

A. I am not a vulture expert, I couldn't tell you that.

Q. Probably a lot more than in this, say, lead sack that they have duct taped up, right there?

A. I would have to agree with that, yes.

18

Air Logistics.  Although Bell asserted at trial that to accomplish this feat would require the addition of hundreds and hundreds of pounds of structure to the Bell 407, altering the utility of the Bell 407 by changing it from a lightweight Part 27 helicopter into a heavier, less maneuverable Part 29 helicopter, the evidence conclusively established that, in fact, Bell made no structural changes to the Bell 407 in order to install the 0.10-inch monolithic polycarbonate bird-impact resistant windshield. 14   Additionally, Bell did not inform Air Logistics of any of the concerns Bell expressed at trial—that the 0.10-inch monolithic polycarbonate bird-impact resistant windshield in the Bell 407 would push through into the Bell 407's cockpit in the event of a bird strike.15

---

14Recall that Allman, Gailey, and Webster, all testified that in 1999, Bell had installed a 0.10-inch monolithic polycarbonate windshield in a Bell 407; no structural changes to the Bell 407 were required prior to the installation of the windshield.

15Allman admitted that although Bell had, subsequent to this crash, put a polycarbonate windshield on a Bell 407 that was forwarded to Air Logistics, Bell had not warned Air Logistics of Bell's opinion that a bird strike would cause the window structure to collapse and the windshield to enter the cockpit.  He was then asked:

> Q.  So back in '99, you know, or you told this jury that it[']s common sense to know that if a bird hits a polycarbonate it's going to knock it out of the structure and it's going to be potentially dangerous or fatal to the pilot.  You sent it down to Air Logistics, had them fly around in it, you didn't tell them about it, and you didn't even change the structure on the 407 for that first windshield, did you?
>
>     . . . .

19

## D. Application of the No-Evidence Standard of Review

In short, even excluding Hinds's testimony, more than a scintilla of evidence exists supporting every fact that the jury was required to find in question 6 to support the safer alternative design element of the windshield design defect claim. Considering all of the above evidence favorable to the jury's safer alternative design finding because a reasonable factfinder could, and disregarding the sometimes contrary and conflicting evidence propounded by Bell's long-time employees and experts because a reasonable factfinder could, more than a scintilla of evidence exists supporting the jury's finding that a safer alternative windshield design existed for the Bell 407 in 1997. *See Cent. Ready Mix Concrete Co.*, 228 S.W.3d at 651; *City of Keller,* 168 S.W.3d at 807.

The above evidence—that prior to 1997, Bell did manufacture numerous bird-impact resistant windshields; that in 1994, Bell developed a coating that solved its problems with polycarbonate windshields; that in 1976, Bell was able to design and manufacture a bird-impact resistant windshield for the Bell 222 to meet European bird-strike standards; that Bell successfully made a 0.10-inch polycarbonate bird-impact resistant windshield for the Bell 407 in 1999 within two months after it began its attempts; and that Bell ultimately did not make any structural changes to the Bell 407 in order to install a 0.10-inch polycarbonate

---

A. When we sent it down to Air Logistics, we did not and are not sure now that it endangers anyone.

bird-impact resistant windshield in a Bell 407—constitutes more than a scintilla of evidence that it was technologically feasible in 1997 for Bell to manufacture a 0.10-inch monolithic polycarbonate bird-impact resistant windshield for the Bell 407 by the application of existing or reasonably achievable scientific knowledge. *See Uniroyal Goodrich Tire Co.*, 977 S.W.2d at 337 (holding testimony that competitors were already using the safer alternative design and the fact that the company switched to the safer alternative design one year after the accident was evidence of its feasibility); *Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.*, 848 S.W.2d 724, 746–48 (Tex. App.—Dallas 1992, writ denied) (holding that evidence of actual use of a safer design by the defendant or others at the time of manufacture is admissible on the issue of defective design and is strong evidence of feasibility). More than a scintilla of evidence also exists that a polycarbonate windshield could have been made economically as early as the 1970s; Bell's own expert testified that cost was not an issue with a material as inexpensive as polycarbonate. Because all of the experts agreed, and even Bell's testing confirmed, that a 0.10-inch monolithic polycarbonate windshield or a 0.14-inch stretched acrylic windshield would have caused the 3.5- to 4-pound black vulture either to bounce or glance off of the windshield, to merely crack the windshield, or to penetrate the windshield in a liquefied form or in pieces, all of which would have prevented the occurrence in question, more than a scintilla of evidence exists that either of the safer alternative design bird-impact resistant windshields

would have significantly reduced the risk of the occurrence in question. *See Bryant v. Giacomini, S.p.A.*, 391 F. Supp. 2d 495, 501 (N.D. Tex. 2005) (recognizing that defendant's expert's admission that alternative design reduced risk was sufficient to allow jury to reasonably conclude that existence of safer alternative design was economically and technologically feasible). Bell's subsequent success in manufacturing and installing a polycarbonate windshield in the Bell 407 without adding any structural weight to the helicopter is more than a scintilla of evidence that a 0.10-inch monolithic polycarbonate bird-impact resistant windshield would not, and in fact did not, jeopardize or diminish the utility of the Bell 407. *See Allen v. W.A. Virnau & Sons, Inc.*, 28 S.W.3d 226, 232–33 (Tex. App.—Beaumont 2000, pet. denied) (holding that "the documentary evidence submitted by appellants shows the same model tractor with the ROPS [Rollover Protective Structure] and the seat belt as standard equipment is some evidence, certainly more than a scintilla, that the combination system did not jeopardize or diminish the utility of the tractor"). Because, even excluding Hinds's testimony the evidence is legally sufficient to support submission to the jury of the safer alternative design element of the windshield design defect claim, I would overrule Bell's second issue.

## III. CONCLUSION

I would hold that the evidence is legally sufficient to support submission to the jury of the safer alternative design element of the windshield design defect

22

claim in question 6.   Because the Majority Opinion holds otherwise, I respectfully dissent.

I concur with the Majority Opinion's disposition of Bell's other issues and of Appellants' issues.

SUE WALKER
JUSTICE

DELIVERED:   August 31, 2011

23